SOCIETY FOR GOOD WILL TO RETARDED CHILDREN, INC., et al., Plaintiffs,

v.

Mario M. CUOMO, as Governor of the State of New York, et al., Defendants.

No. 78–Civ.–1847.

United States District Court, E.D. New York.

Aug. 10, 1983.

See also D.C., 572 F.Supp. 1298.

Murray B. Schneps, Michael S. Lottman, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City by Caren S. Brutten, William J. Caplow, Frederick K. Mehlman, Asst. Attys. Gen., New York City, Alan M. Adler, Deputy Counsel, State of N.Y., Albany, N.Y., for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

This litigation plumbs the despair and guilt of society and of the parents of profoundly retarded children. Mothers and fathers, after courageous struggles to care for their offspring at home, overwhelmed by lack of respite and assistance, felt compelled to turn over responsibility for them to the state. They acted reluctantly in order to save a modicum of sane living for their families and because they believed the state could do more for their deprived youngsters than they could.

Some twelve hundred clients are housed at the Suffolk Developmental Center. Their dismal lives are relieved by the love and devotion of many of the parents and members of the Center's staff. New York (aided by the federal government), while doing less than the Constitution and laws require, has made many millions of taxpayers' dollars available.

The substantial efforts on behalf of these disabled people remind us that ours is fundamentally a compassionate and caring community. Once such people would have been exposed on a mountainside to die or would have been hidden in shame. Now they are kept alive and in view. But the law, expressing the concern of the state and nation for each person, requires that more than existence be preserved. It insists that some degree of humanity and dignity be safeguarded. As indicated below, the state

has done less than the Constitution mandates. Accordingly, the courts are compelled to order that it do more.

## I. PROCEDURE

A class action was commenced on August 23, 1978 by the Society for Good Will to Retarded Children, Inc., the parents' organization at Suffolk Developmental Center (the Center), and 13 mentally retarded individuals on behalf of themselves and more than 1,500 other persons then in residence at, or on the rolls of, the Center. Plaintiffs seek, on various constitutional and statutory grounds, 1) the improvement of conditions at the Center, 2) the expansion of community resources and support services in Nassau and Suffolk counties for the mentally retarded and for their families and 3) transfer of most of the clients at the Center to small community residences.

Defendants, sued in their official capacity, are the Governor of the State of New York and the personnel of the New York State Office of Mental Retardation and Developmental Disabilities. Jurisdiction is not disputed. 28 U.S.C. §§ 1331, 1343.

The Center was opened in 1965. It is a state-run residential institution for the mentally retarded on 465 acres in Melville, Long Island, New York. 1,209 individuals now reside there. Most of the buildings house severely handicapped individuals in wards that generally contain between 20 to 25 beds. Many of the clients are non-ambulatory and physically disabled. There are also eight or nine "cottages" with somewhat smaller wards for less severely retarded clients capable of walking and taking care of some of their own functions. The Center has a "medical-surgical" building (number 16) with one "acute" and three "chronic" wards, as well as two wards housing non-ambulatory clients and a pulmonary unit for 25 clients with upper respiratory problems (building 19). Four buildings (4, 9, 20 and 21) are used exclusively for program activities.

Administrative responsibility for the Center rests with defendant Fred McCormack who, as Director of the Long Island Developmental Disabilities Services Office, is also in charge of the state's community placement in Nassau and Suffolk counties. Mr. McCormack reports to defendant Elin Howe, Associate Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities for the Southeastern County Service Group, answerable (through Deputy Commissioner Samuel Kawola) to defendant Commissioner Zygmond Slezak, who reports ultimately to the defendant Governor. [Extensive references to pages in the record and exhibits as well as appendices are in the typescript copy on file in the clerk's office.]

Certified as a class action on May 15, 1980, the case was tried without a jury. Court proceedings included over 21 trial days during March, April, September and October, 1982 in addition to numerous conferences and motions. The Court has heard more than 50 witnesses and received over 300 exhibits. Some 4,000 pages of transcripts were recorded.

On February 24, 1983, following the last of its three visits to the Center, the first in November 1978, and the second and third in February of this year, the Court issued an interim memorandum finding that conditions and treatment at the Center failed to meet the minimum standards required by the Constitution. It ordered the Director to prepare a written four year plan that would meet constitutional standards. That plan was submitted to the Court on April 24, 1983.

Public hearings on the plan were held by the Court in June 1983 at the District's Brooklyn and Uniondale courthouses. Parents and spokespersons for private and governmental agencies as well as unions representing workers at the Center appeared. During those hearings the Court issued oral orders to amend the Director's plan. As modified, that plan is now embodied in this Court's decree.

## II. MENTAL RETARDATION

### A. *Definition*

Mental retardation, the basis for residence at the Center, is defined as 1) signifi-

cantly sub-average intellectual functioning (i.e., two standard deviations below the mean on an intelligence test), 2) combined with significant deficiencies in adaptive behavior (i.e., appropriate exercise of personal independence and social responsibility), and 3) manifested in the individual's developmental period.

Of 1,204 Center residents assessed as of March 1982, 11 were considered to be of normal intelligence, 40 to be mildly mentally retarded (IQ 52 to 69), 73 to be moderately retarded (IQ 36 to 51), 147 to be severely retarded (IQ 20 to 35), and 933 to be profoundly retarded (IQ below 20); the functioning level for 17 clients was unknown. Reduction in population has resulted in leaving the most difficult cases at the Center. Whereas the client population of the Center in 1974 (total 1,774) was 4% borderline or normal, 7% mildly retarded, 13% moderately retarded, 22% severely retarded, and 52% profoundly retarded, the comparable percentages at present are 1% normal, 3% mildly retarded, 6% moderately retarded, 18% severely retarded and 68% profoundly retarded. Approximately 55% of the current population is male; 1% is under age 12; 14% are between ages 13 and 20; 58% between ages 21 and 34; 24% between ages 35 and 64; and 2% are over age 65. Those who are of "normal" intelligence appear to have been sent to the Center as a result of historical mistakes in classification as in the case of a deaf mute who was thought to be retarded. Many of the clients were kept at home by their parents until, in their early adolescence, they became hyperactive and overwhelmed their families.

### B. *History*

In post-medieval times the retarded, together with imbeciles, idiots, madmen, the feeble-minded and the insane, from whom they were not generally distinguished, were viewed as the progeny of the supernatural, and in the last several centuries as agents of the devil. *See* L. Kanner, A History of the Care and Study of the Mentally Retarded 5–7 (1964); W. Wolfensberger, The Origin and Nature of Our Institutional Models, in Changing Patterns in Residential Services for the Mentally Retarded (President's Committee on Mental Retardation, 1976) 36. Vestiges of that attitude may be found today. Recently, a 14 year old retarded boy was discovered who had been kept a virtual prisoner in his home from birth. The boy's father apparently feared that his son's condition would shame or embarrass the rest of his family. N.Y. Times, October 9, 1982, at 8, col. 6.

Impetus for the institutionalization of the mentally retarded may be traced to the reform impulse in Western social thought accompanying political upheavals at the end of the eighteenth century. The revolutionary legacy resulted in new perceptions of both the potential for human improvement and of the role of the state in providing the necessary services. *Compare* B.W. Tuchman, A Distant Mirror: The Calamitous Fourteenth Century 108 (Ballantine ed. 1979) ("cure being left to God").

In nineteenth century America the movement to institutionalize the mentally retarded arose in response to several interacting factors. The theoretical groundwork had been laid in France in the mid-eighteenth century when Jacob Rodrigues Pereire had shown that deaf mutes, thought completely uneducable until then, could be taught to read and communicate through sign language. *See* L. Kanner, *supra,* at 11. This led to the view that others, such as idiots who had likewise been thought to be incapable of responding to education, could benefit from it. Jean Marc Gaspard Itard's subsequent work with Victor, the "wild boy of Aveyon," further intensified professional interest in the education of idiots. Victor, an apparently severely retarded child was found in the forest, where he had roamed "wild" for some years, probably after his family had abandoned him. Gaspard taught him to walk upright, speak, feed and dress himself. *See* L. Kanner, *supra,* at 12–16; Mason and Menolascino, The Right to Treatment for Mentally Retarded Citizens: An Evolving Legal and Scientific Interface, 10 Creighton L.Rev. 124, 127–28 (1976).

The first school for the feeble-minded was established in Abendburg, Switzerland in the 1840's by Johann Jakob Guggenbuhl. See L. Kanner, supra, at 17–26. It was visited by Samuel Gridley Howe who shortly thereafter began the first publicly supported school for retarded children in Massachusetts in 1848. L. Kanner, supra, at 25, 41. Itard trained the French-born Edouard Onesimus Seguin, who spent 18 months in 1837–38 educating an idiot boy so that he could "make better use of his senses, could remember and compare, speak, write and count." L. Kanner, supra, at 35. Seguin later came to the United States as a general consultant on the education of idiots. L. Kanner, supra, at 37.

The emphasis accorded education as a means of treatment for the mentally retarded was predicated on an assumption that mental retardation was a disease, like other similarly perceived problems of the mind, such as insanity, and of the spirit, such as criminality. The social reformers' vision of institutionalization of the mentally retarded melded this faith in the curative potential of education, and concomitant assumption that retardation was curable, together with the view that such diseases derived from defects in the environment.

Itard's and Guggenbuhl's work was thought to have demonstrated that the environment could be both the cause of and cure for mental defects. See D. Rothman, The Discovery of the Asylum 131 (1971). Thus, by altering or modifying the environment to purge noxious elements, the mentally retarded person, it was supposed, could be made well. See D. Rothman, supra, at 111. The notion underlying temporary confinement was removal of those unable to cope with the strains and uncertainties of life in the community. Rehabilitation would occur by providing such individuals with an environment of calm and regular routine. D. Rothman, supra, at 133. The first institutions, like many of the later ones, were built away from urban centers and with an architectural emphasis on order and regularity. D. Rothman, supra, at 137–138, 142, 152–153.

The founders' fundamental belief in their institutions as forums of cure was rooted in a vision of their function as one of education, not of custody. During the second half of the nineteenth century, however, it became apparent that the idiocy and feeblemindedness for which institutional treatment had been prescribed was neither being cured nor made better by the institutions. D. Rothman, supra, at 282. The rationale of rehabilitation gave way to one of custody. D. Rothman, supra, at 265; W. Wolfensberger, supra, at 52. Since institutional residence became permanent rather than temporary, the number of residents grew dramatically. State legislatures' appropriations, however, did not keep pace with the increase in institutional populations resulting in the overcrowding, understaffing, and lack of workshop and programming materials that continue to characterize many large institutions, including the Center. See D. Rothman, supra, at 269–270; W. Wolfensberger, supra, at 53–54.

A parallel pattern of optimism replaced by pessimism characterized the hope for cure that led to the institutionalization of criminals. That vision, however, has left a legacy of overcrowded and often brutal prisons where hope for rehabilitation is almost abandoned. D. Rothman, supra, at 79.

In the twentieth century the environmental theory of the origin of mental defects was replaced by a social Darwinism that recycled the trappings of the reform ideology. D. Rothman, supra, at 260–295. Thus, confinement and physical isolation from the community were perpetuated under a new rationale that sought to protect society from the retarded, and the retarded from society, rather than to educate them for entry into it. See D. Rothman, supra, at 285–286; W. Wolfensberger, supra, at 51–53; L. Kanner, supra, at 85–86.

Fear of the mentally retarded was embodied in the eugenics scare that followed Goddard's publication of the Kallikak monograph in 1912. It traced social immorality and criminality to genetically inherited feeble-mindedness. See L. Kanner, supra, at 130–132; W. Wolfensberger, supra, at 54–

58. Politically, that fear was manifested in the enactment of various state statutes preventing marriage with the feeble-minded and insane, see W. Wolfensberger, *supra,* at 59, and providing for compulsory sterilization to prevent the procreation of more "confined criminals, idiots, imbeciles, and rapists." L. Kanner, *supra,* at 136; W. Wolfensberger, *supra* at 59. *See generally* Cynkar, *Buck v. Bell:* "Felt Necessities" v. Fundamental Values?, 81 Col.L.Rev. 1418 (1981). In the view of some, the institution became the guardian of preventive segregation. *See* W. Wolfensberger, *supra,* at 60.

### C. *Current Theory*

It has now been recognized, both by experts in the field and by Congress, that the premises underlying the reform ideology which gave rise to institutionalization have not proven sound. Mental retardation is not solely the product of social environmental forces gone astray, as the Jacksonians once believed. It is no longer regarded as a disease, curable or otherwise.

The medical model of treatment by passive care is generally being replaced throughout the country by the developmental model. Emphasis is placed upon training to maximize potential for adjusting to as close to a normal existence as is practicable. *See* D. Rothman, *supra,* at 11, 115–116, 122. Yet, the Jacksonian intuitions were not entirely unfounded. While today education is not regarded as a total panacea for the mentally retarded, it has been recognized

> that retarded persons, regardless of the degree of handicapping conditions, are capable of physical, intellectual, emotional and social growth, and ... that a certain level of affirmative intervention and programming is necessary if that capacity for growth is to be preserved, and regression prevented.

*New York State Association for Retarded Children, Inc. v. Carey,* 393 F.Supp. 715, 717 (E.D.N.Y.1975) (approving and quoting from Willowbrook consent judgment). *See generally Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473 (D.N.D. 1982); *Philipp v. Carey,* 517 F.Supp. 513, 517–518 (N.D.N.Y.1981); *Kentucky Association for Retarded Citizens v. Conn,* 510 F.Supp. 1233, 1245 (W.D.Ky.1980); *Naughton v. Bevilacqua,* 458 F.Supp. 610, 615 (D.R.I.1978), *aff'd,* 605 F.2d 586 (1st Cir. 1979); *Woe v. Mathews,* 408 F.Supp. 419, 427–428 (E.D.N.Y.1976); *aff'd sub nom Woe v. Weinberger,* 562 F.2d 40 (2d Cir. 1977); *see also* N.Y. Const. Art. 17, § 4; The Education of the Handicapped Act, 20 U.S.C. § 1400 et seq. (1976 & Supp. V 1981) and S.Rep. No. 168, 94th Cong., 1st Sess., *reprinted in* 1975 U.S.Code Cong. & Ad. News 1425; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. V 1981); The Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000 et seq. (1976 & Supp. V 1981); *see generally O'Connor v. Donaldson,* 422 U.S. 563, 569, 95 S.Ct. 2486, 2490, 45 L.Ed.2d 396 (1975); *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972); *New Jersey Association for Retarded Citizens v. Human Services,* 89 N.J. 234, 445 A.2d 704 (1982).

The new consensus among experts, including those employed by the State of New York, recognizes the priority of the principle of normalization to the extent practicable. *See* N.Y. Office of Mental Retardation and Developmental Disabilities, Handbook of Staff Training Instructional Material, defining normalization as "... making available to the mentally sub-normal, patterns and conditions which are as close as possible to the norms and patterns of the mainstream of society." Most modern authorities envision the placement of mentally retarded individuals in a variety of residential and programmatic settings, selected in accordance with a determination of each person's needs and potential for living as independently and as "normally" as possible.

Increased public attention to the condition of the mentally retarded has led to marked advances in the quality and delivery of services to them. Advocacy efforts

of parents' and concerned citizens' organizations such as the National Association for Retarded Children, established in 1950, *see* H.R.Rep. No. 694, 88th Cong., 1st Sess., *reprinted in* 1963 U.S.Code Cong. & Ad. News 1054, 1060, together with the recommendations of the President's Committee on Mental Retardation, *see generally* H. Cohen, Trends in Service Delivery and Treatment of the Mentally Retarded, 11 Pediatric Annals 458 (1982), have led Congress to appropriate millions of dollars for research on the causes and prevention of mental retardation, *see* H.R.Rep. No. 1188, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 7312, 7358–59, to provide access for the handicapped to federally subsidized programs, *see* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and to codify findings respecting appropriate treatment and habilitation of persons with developmental disabilities and specify conditions for funding state plans. *See* the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6010, 6063.

In New York State, there has been similar concern about provision of services for the mentally retarded. The Legislature has specified:

> ... it shall be the policy of the state to conduct research and to develop programs to further the prevention and early detection of mental retardation and developmental disabilities; to develop a comprehensive, integrated system of services to serve the full range of needs of the mentally retarded and developmentally disabled by expanding the number and types of community based services for the mentally retarded and developmentally disabled by serving persons in the community as well as those in developmental centers, by improving the conditions in developmental centers, and by establishing accountability for carrying out the policies of the state with regard to the mentally retarded and developmentally disabled.

To accomplish these goals and meet the particular needs of the mentally retarded and developmentally disabled, a new autonomous agency to be known as the office of mental retardation and developmental disabilities has been established. The office and its commissioner shall plan and work with local governments and voluntary organizations and all providers of services to the mentally retarded and developmentally disabled to develop an effective, integrated, comprehensive system for the delivery of all services to the mentally retarded and developmentally disabled and to create financing procedures and mechanisms to support such a system of services to ensure that mentally retarded and developmentally disabled individuals in need of service receive appropriate care and treatment close to their families and community. In carrying out these responsibilities, the office and its commissioner shall make full use of existing services in the community including those provided by voluntary organizations.

Added L.1977, c. 978, § 11, N.Y. Mental Hygiene Law § 13.01. *See also* N.Y. Mental Hygiene Law § 13.07 (providing that state Office of Mental Retardation and Developmental Disabilities is responsible for "the development of comprehensive programs and services in the areas of research, prevention, and care, treatment, rehabilitation, education, and training of the mentally retarded and developmentally disabled."); *Id.* § 13.23 (providing for education and training programs for the mentally retarded); *Id.* § 13.24 (providing for the funding of sheltered workshops, work activity and day training services); *Id.* § 33.03 ("each person receiving services for mental disability shall receive care and treatment that is suited to his needs and skillfully, safely, and humanly administered with full respect for his dignity and human integrity"); *Id.* § 33.11 (retarded children to be provided the same education "they would otherwise be entitled to receive in their local school districts").

New York has given particular attention to the concept of normalization in the least restrictive environment practicable. Thus,

The legislature hereby finds and determines that mentally disabled individuals have the right to attain the benefits of normal residential surroundings. It is further found that the opportunities for mentally disabled individuals will be enhanced, and the delivery of services improved, by providing these individuals with the least restrictive environment that is consistent with their needs, and that such environment will foster the development of maximum capabilities. It is the intention of this legislation to meet the needs of the mentally disabled in New York state by providing, wherever possible, that such persons remain in normal community settings, receiving such treatment, care, rehabilitation and education, as may be appropriate to each individual.

Legislative Findings and Intent, L.1978, c. 468, § 1, *quoted in* N.Y. Mental Hygiene Law § 41.34. *See also id.* § 41.01 (law designed to develop and expand local community programs and services).

### D. *Continuing Problem*

Testing technologies, such as prenatal diagnosis and genetic counseling have become increasingly refined as public awareness of mental retardation grows. Yet most of the causes of retardation are still unknown. Approximately three percent of the population is believed to be affected; of these, 75 percent are mildly retarded, 20 percent moderately retarded, and 5 percent severely or profoundly retarded. Acquired (non-hereditary) causes, such as infection, trauma, toxins, hormonal deficiencies, severe sociocultural deprivation, protein malnutrition, and various unknown and known environmental hazards such as radiation, and lead poisoning, account for at least five percent of mental retardation. *See* Lorincz, Perspectives on Planning for Prevention of Mental Retardation, in Planning for Services for Handicapped Persons 78–79 (1979); Taft and Cohen, Mental Retardation, in Pediatrics 1769 (16th Ed.1977). Genetic causes, both those known to be due to chromosomal abnormalities, such as Downs syndrome, or genetically determined metabolic

disorders, such as Tay-Sachs disease, or endocrine disorders, of which there may be more than a thousand, are probably responsible for another 20 percent. The remainder are classified as polygenic disorders, such as the fairly common neural tube defects in the fetus; they may be caused by some interaction of environmental and genetic factors. *See id.*

Research in prevention has grown. Close attention is now being accorded prenatal diagnosis, through such means as amniocentesis, pulse-echo sonography (ultrasound), fetoscopy/placental aspiration (analysis of a fetal blood sample), and measurement of fetal protein in the amniotic fluid, particularly with mothers under age 20 and over age 35. *See generally* Antenatal Diagnosis, U.S. Department of Health, Education and Welfare, April 1979, at 1–10. Emphasis is also being placed on care of the unborn child by discouraging the taking of drugs, smoking and drinking alcohol during pregnancy; the anticipation of "at-risk situations" for women who have previously borne babies with a chromosome abnormality or with an open spine defect, or where one of the parents has a chromosome abnormality; and genetic counseling and screening of the newborn to prevent various retardation-causing diseases, such as hypothyroidism. *See* Mental Retardation: Prevention Strategies That Work, Report to the President (1980); Mental Retardation: The Leading Edge, Staff Report of the President's Committee on Mental Retardation 68–71 (1978). *See generally* Prevention Plan, Preliminary Report, New York State, Governor's Conference for the Prevention of Developmental Disabilities and Infant Mortality, May 1981.

Genetic counseling, contraception, abortions and medical advances may, the testimony indicated, reduce somewhat the number of retarded children in the future. But this advance may be more than counterbalanced, it was suggested, by increasing chemical or radiological environmental hazards, as well as by other factors such as the increasing tendency toward child bearing by the very young and by older women.

The potential interplay of these demographic, environmental and medical facts is difficult to predict. There was no disagreement, however, that retardation of children will continue to be a problem. With better medical treatment of the retarded, their age span increases.

The result of all these developments is the likelihood that the percentage of mentally retarded and developmentally disabled will probably not decline absolutely or as a percentage of our population. Thus, the legal issues presented by this case are by no means transient or peculiar to the Center. They will be with us for the foreseeable future in many guises.

Litigations of this kind create difficult dilemmas for legislatures, executives and courts. Aiding one group may further disadvantage others. The chairman of the Mental Hygiene Committee of the New York Senate, for example, noted

> most of those [severely retarded in boarding schools] should be going to group homes. Instead, these residences are being filled as soon as they open, with adults who have been living in large institutions. Many of these adults are moved because of court orders.

Bill to Help Retarded at Age 21, N.Y. Times, July 24, 1983, § 1, at 23, col. 1. With such problems in mind, the decree has been formulated to permit improved services to those in the Center as well as those outside of it.

What is also clear is that present professional views are not forever fixed. Home or community care is not a panacea, only an improvement in a difficult situation. It follows that professionals and the political system must be afforded considerable flexibility in meeting the new problems that undoubtedly will result from the depopulation of large institutions built when different theories prevailed.

## III. FACTS

### A. *Conditions at Suffolk Developmental Center*

The Willowbrook Consent Decree requiring major improvements at the Staten Island Developmental Center became final in 1975. *See New York State Association for Retarded Children, Inc. v. Carey,* 393 F.Supp. 715 (E.D.N.Y.1975). After the decree was signed, plaintiffs' witness Edward Jennings became Associate Director of the Willowbrook task force organized to monitor implementation of that decree. In Jennings' words, the decree was accepted by New York State "as a guidepost to [be extended to] all of our clients across the state." Jennings is currently Director of the State Developmental Disabilities Services Office at Letchworth Developmental Center, responsible for all services for the mentally retarded in Rockland, Orange and Sullivan Counties; included in his charge are community-based day and residential programs. His job is equivalent to that of the Director of Suffolk Center.

In August 1978, following the filing of the complaint in this case, Thomas Coughlin, then the State Commissioner of the Office of Mental Retardation and Developmental Disabilities, asked Mr. Jennings to prepare a report evaluating "problems" then existing at the Suffolk Center. That report was issued in October 1978. While the report is not in evidence, Mr. Jennings, as a witness, did describe his findings.

Jennings' testimony serves as an introduction to those problems that made conditions at the Center unacceptable in 1978, when this suit was commenced. He found all areas he observed deficient and concluded that the Center was not "appropriate" for its residents. Although at the time Jennings' investigation was conducted each developmental center in New York State was required to use an Operational Plan for both management and programmatic purposes, the task force found that the Suffolk Developmental Center's operational plan was not being implemented. Jennings recommended that the plan be scrapped because "[i]t wasn't a workable document at that time." Failure of the Suffolk Operational Plan in 1978 was indicative of substantial "management deficiencies." Those deficiencies suggest far more significant

problems that made and continue to make environmental and programming conditions at the Center constitutionally unacceptable.

### 1. *Staffing*

#### a. *Direct Care Staff*

##### (1) *Lack of Interaction With Clients*

In 1978, Jennings observed a substantial lack of interaction between the clients and the direct care staff. He acknowledged the frequency of scenes in which residents were found sitting, rocking, lying on the floor, and generally doing nothing in front of a blaring television set in the dayroom, while the staff watched television. Similarly, the federal inspection team described in their May 25, 1978 survey:

> Weekend of May 20, 21, acute care residents were in day rooms with no organized activities—merely listening to ballgames on the T.V. with one staff member present.

To the survey team's charge that understaffing was responsible for this deficiency (and its recommendation of additional staff and training programs) Center officials responded: "Because of budget limitations, additional staffing beyond what is allocated for each ward, is an impossibility."

Lack of interaction between staff and clients still exists. Dr. James Clements, a pediatrician and an expert in mental retardation, who has had responsibility for all mental retardation services in Georgia, first visited the Center in the summer of 1976 as Chairman of the Willowbrook Review Panel. On February 6 and 7, 1981, and on March 5 and 6, 1982, a few days before his testimony in this case, he visited the Center again. Clements described his impression from his tours as follows:

> I guess the most, all pervasive feeling, impression that I got at Suffolk during this past visit and the other times that I had been there is that it is a place of idleness. In almost every area at Suffolk in which I visited people were sitting and waiting or lying in bed and waiting. There was virtually no organized activity going on in any area of Suffolk Develop-
> ment Center that I visited .... It is a place in my opinion that is harmful to every resident who resides there.

*See* photographs taken during Clements' February 1981 and March 1982 tours showing barren dayrooms; residents, sometimes unclothed or partially clothed, are lying on bare floors, apparently doing nothing.

George Fearing, whose 36 year old son, Donald, has lived at the Center since 1969, testified that generally when he arrived on Sundays to take Donald out for the day,

> I would find him either walking around stark naked, or walking around with a pair of dirty pants.

The staff were not doing anything with Donald; they were "[s]itting in the dayroom watching television."

Mildred Karp, another parent who frequently visits her 30 year old daughter, Barbara, on the weekends, had similar observations of her daughter's dayroom in Ward A of Building 21:

> ... there is very little activity other than sitting—most of the time I find my daughter sitting on the floor, no shoes or socks on Sometimes there are partially disrobed children, adults, they are adults, really most of them. Partially disrobed, doing nothing ....

The staff "are sitting sometimes, sometimes they are doing paperwork in the office within the ward, sometimes they are doing the laundry or just sitting and watching the television."

Dominica Moses related that when she went to visit her sister, Nicolina Coster, at Building 4 on an August evening in 1981:

> As I got out of my car at the building I heard screaming, very very loud screaming.... As I entered the room, one of the residents was beating my sister. The woman who was on duty was in the front of the room watching television; she never turned her head.

Lyn Rucker, an expert in mental retardation and Director of Retardation Services for sixteen counties in Southeast Nebraska, visited the Center on August 27 and 28, 1982. She observed that:

In the majority of the buildings, the staff were sitting, or standing away from the clients. There were no, or very few contacts between staff and clients.

Brian Lensink, another mental retardation expert who has directed Arizona's programs and services for the mentally retarded and developmentally disabled for seven years, visited the Center on February 14, 15 and 16, 1982 and on September 2 and 3, 1982. Describing various residential buildings he visited during his February 1982 tour, he found the Clients:

generally sitting around the peripheries of the room rocking, self-stimulating in one way or another.

They were seeking a tremendous amount of attention, coming up to you, wanting to touch and hold. But the idleness was what affected me the most.

This lack of interaction has an adverse effect on clients. If there were greater staff attention they would be exposed to far less risk of injury. Negative behavior often continues uninterrupted, permitting the clients with behavior problems to harm themselves, as well as other clients around them.

Mental retardation expert Kathleen Schwaninger, formerly responsible for all services to the mentally retarded in Massachusetts and now executive director of a voluntary agency providing programmatic and residential services to the retarded in New York City, testified at length. She most recently inspected the Center on March 17 and April 2, 1982. While there she observed inappropriate behavior in the lunchroom such as clients "getting up from the table and moving around," and "grabbing food." During the meal, "the staff did not interrupt the clients or direct them to a positive meal time behavior . . . ."

Clients are denied the opportunity to learn to relate to other human beings. Thus, Brian Lensink noted that the residents

have no opportunity to meet normal people. One of the best training devices we know of is modeling, observing other people's behavior and modeling it, doing it yourself. And we give the people in a large setting like that every opportunity to model inappropriate behavior . . . and very few opportunities to model appropriate behavior.

A number of factors explain this problem: particularly the insufficient number of staff, the use of a staffing system based on "critical minimum" requirements, and the lack of adequate staff training. One symptom of lack of trained staff is the excessive use of direct care aides known as floaters. They are shifted from ward to ward as shortages of staff develop. The result is that they often do not know the client's needs and it becomes more difficult to maintain any consistent training program. For retarded children, to a far greater extent than in the case of normal children, uniform patterns of conduct and predictable relationships with people that care for them are essential.

These criticisms should not obscure the genuine love, concern, and commitment which a great many of the direct care staff have for the clients and their welfare. Like Margie Grant, many of the staff are hooked on the clients. Considering the obstacles they face, staff members are to be commended for doing as well as they do.

Nevertheless, even the most well-meaning staff cannot be expected to perform adequately when they are insufficient in number, poorly trained and supervised, and unfamiliar with the plans developed for the clients.

(2) *Insufficient Number of Staff*

(a) *The Number of Direct Care Staff*

Edward Jennings testified that a minimum staffing ratio of 1.78 to 1 overall was necessary to provide the state-mandated six hours of programming each day to each resident and to insure adequate and appropriate care. According to Mr. Jennings, an optimal ratio would be 2.2 or 2.1 to 1. Fred A. McCormack, Director of the Center, testified that 1.83 "is professionally desirable." He pointed out, however, that the state provided only the 1.78 level. In 1978 the

staffing ratio at the Center was only 1.56 to 1, substantially below what defendants and defendants' experts have testified to be the minimum required for adequate care. And in March 1982, the ratio was 1.72—still below that minimum.

These ratios are more than abstract numbers. An increase of .1 in the staffing ratio translates into an additional 120 staff members since the population presently is roughly 1,200 clients. This number of added workers can have an enormous impact on client care.

Zygmond Slezak, Acting Commissioner of the Office of Mental Retardation and Developmental Disabilities for the State of New York, acknowledged that no developmental center in the State of New York has a lower staff ratio than the Suffolk Center and many have a higher one.

Plaintiffs' experts, all of whom are qualified professionals in the field of mental retardation, each spent at least two days, usually more, visiting the Center in 1982. They found insufficient direct care staff to meet the needs of the clients, thereby increasing the likelihood of injuries and of the acquisition or aggravation of self-stimulating or other negative behavior. Maria Saracino, a direct care staff worker at the Center agreed:

I feel greatly that the amount of staff that has been allocated to us is not sufficient to take care of the amount of residents.... They should be receiving better care, and more staff is definitely one way it could be accomplished.

For example, Lisa Gorelick, one of the named plaintiffs, a profoundly retarded resident of the Center, has a pair of expensive orthopedic braces, without which she cannot attempt to learn to walk. She is not able to wear her braces because there is not enough staff to make sure she does not fall over when she wears them. The result is that Lisa remains in a wheelchair though she should not.

Joseph Ryan, the Deputy Director of the Center, responsible for its daily operations, acknowledged that more staff is needed to maintain an acceptable level of care. *See*

1982–83 Budget Request for Suffolk Developmental Center made by the Office of Mental Retardation and Developmental Disability as Submitted to Executive Department.

(b) *Impact on the Clients*

Direct care staff must often devote their limited time to various housekeeping tasks such as laundry and making beds, so that even though they are present on the wards, they are prevented from interacting with the clients. The result is that staff does not have the time to actively teach clients self-care skills such as toileting and how to wash, dress and feed themselves. As Margie Grant, a mental hygiene therapy aide testified, rather than teaching a client to brush his or her teeth, the staff person does it, because there is no time for the patient training that is required. She testified as follows:

Q Have you ever been trained in techniques to teach residents who can't dress themselves, to do any of those skills?

A No.... We don't have time with the number of staff to give the clients time to learn, or even to do it.... How can you do that in a given time, hand him the toothbrush, and give him the toothpaste, and wait. You must be patient in this job. But what you do, you end up brushing the teeth themselves, because they get brushed that way....

Q Is that the same situation with bathing them, combing their hair?

A Absolutely. There is not sufficient time to do that....

Q You indicated that you knew of some goal plans?

A Yes, but they were never worked on.

The staff's role is generally to do for the clients, rather than to teach and help the clients do for themselves. As expert Kathleen Schwaninger testified:

Q Is there a difference between training or programming on the one hand and

doing for the client on the other hand, dressing the client, feeding the client?

A    There is much difference between that, and it is probably best described as analogous as to how we raise our own infants. . . . That same kind of teaching pattern applies to mentally retarded individuals: . . .

Q    If retarded people are not divided into the kind of programming that you just described, in your opinion what would be the effect on them?

A    They will not develop to their full capacity. . . . Typically they will lose skills.

Thus, the lack of enough staff often denies the clients the most effective kind of learning experience for the acquisition of self-care skills in such basic areas as toileting, eating, washing and dressing. Such opportunities are particularly crucial in the learning process of mentally retarded persons, said Ms. Schwaninger,

> because the symptomology of mental retardation is that the individuals learn much slower. . . . In other words, if you put one shoe on a mentally retarded individual and he learns to tie that particular shoe and a week later you place a different shoe on his foot, most of the time the individual will not make the association with being able to tie his shoe. . . .
>
> Because, one of the symptoms of mental retardation is the presence of short-term memory. In order to compensate for these folks not being able to remember as well as we do, and retain it, practice and a great deal of practice for retention purposes is necessary.

Without consistent reinforcement in the residential context of the skills acquired at day programs, the skills are generally lost. As Joel Levy, director of a private voluntary agency providing residential and day program services to the mentally retarded, including the multiply handicapped and profoundly retarded, in New York City and Westchester County, put the matter:

> Without the day treatment program the residential program would be doomed to failure. Without some support at home, whether it is in the home with the parents or within the residential program [the day program] also would be doomed to failure. Such opportunities for consistent practice of self-care skills are built into the community living environment.

Phyllis Killigrew, a member of the direct care staff at the Center since the spring of 1981, described the work of the direct care staff generally as ". . . more like custodial care—babysitting."

When Kathleen Schwaninger spoke to the direct care staff on her visits to the Center, they "reported consistently that their job is to take care. In other words, wash people. Clean people up. Toilet them. Not train them." Ms. Schwaninger attributed this custodial view to a number of factors: 1) staff members are not given training that will equip them to teach the clients; 2) insufficient staff leaves no free time to devote to teaching clients; 3) staff does not recognize that it is expected to teach; 4) there is a widespread perception that only the professional staff are capable of training the clients; and 5) there is a natural inhibition against communicating with clients who themselves are non-verbal.

There is also the self-fulfilling prophecy of client incapability. As Brian Lensink commented,

> I looked at a lot of residents and I was informed that the vast majority of the people there were profoundly retarded. The numbers, in fact, were 900 profoundly retarded; 250 severely retarded; 100 moderately; and 50 mildly. . . . I felt most of those folks had more potential than what was indicated from the figures. [But t]he staff has expectations established for them that I think are much lower than could be established.

On many occasions even the custodial function goes unfulfilled. This is evident in Lyn Rucker's description of the lunchroom in Building 28 on a Saturday in late August, 1982:

> I think this is one of the hardest experiences for me on this particular tour, in that you had 84 individuals in a lunch-

room trying to eat, staff that were trying to assist as best they could; but I saw no active feeding programs.... And there were other people making attempts to feed themselves, and the staff person was standing there doing nothing. And then they grab the hand and shove it up to their mouth and say eat.... I felt sorry for everybody in that room, and especially the gentleman with the pureed food being slapped into his face.

Ms. Rucker also described another scene, in Building 27, in which she observed and heard through a glass wall a sixteen year old hydrocephalic resident in a cart with wooden sides banging her head, very severely, against the cart. The staff did nothing to stop this potentially very harmful behavior until the official with whom Ms. Rucker was touring interceded.

Until recently, psychotropic drugs and various kinds of physical restraints were used, and misused, to control behavior since there was not enough staff to work with clients on behavior modification programs. Judy Walker, who has worked at the Center for over fifteen years, and is currently the nursing program coordinator, testified that in 1978 residents were being regularly given thorazine and other drugs for behavior control purposes. Drugs were used she said, "because we had no other alternatives. Right now we can afford and we do take clients off medication because we have treatment plans. Then we didn't have treatment plans. We didn't have intervention." Today there are still between 600 and 900 Center clients out of a population of 1,200 who receive some form of psychotropic drug. Liver damage has been detected in several residents due to the large amounts of medication given them.

Ambulatory clients are still locked into wheelchairs or confined in them by tabletop lap boards. Lyn Rucker testified, based on her visit to the Center in late September 1982, that clients are subjected to an unnecessary degree of physical restriction. Brian Lensink agreed with Ms. Rucker and added:

You probably would not need the medications or the other kinds of restraint programs if you were to give the person the programming in the first place. Occupy his time and give him something productive with his time. Many of these behaviors are for the opportunity to get attention. They become quite well learned and extremely difficult to deal with when they have been reinforced or not dealt with in the appropriate manner in the first place.

### (c) Use of the "Critical Minimum" and of "Floating" Staff

The Center Policy Manual defines "Critical Staffing Numbers":

Each ward has been assigned a specific number of employees that must be on duty to maintain life and safety standards of the clients. When staffing falls below this critical number, pool staff and/or overtime shall be used.... No unit shall schedule staff at or below critical numbers.

Marian Ball, who was Acting Director of the Center from February through August 1980 understood that

the critical number was to be that number of employees on duty at any particular building or ward, it would be the bottom line, no more no less. That is the least amount of employees that should be on duty.

Though intended only for emergency situations, or as a last resort, the wards at the Center are often staffed only by the critical minima. Brian Lensink testified that "[m]ost cottages were at critical minimum when we asked."

Deputy Director Ryan agreed that the Center often has a hard time providing the requisite critical numbers. Use of 16 hour shifts were, as a result, not uncommon. He claimed that those who work such shifts "are not completely exhausted." Nevertheless, it can come as no surprise that there are substantial morale problems among the direct care staff at the Center. As Kathleen Schwaninger observed,

[t]he staff gets very tired. Staff has to work overtime, can work two shifts, or

are asked to work two shifts. Consequently, their interest and their desire for their effectiveness in working with clients is compromised. Sometimes staff will even fall asleep....

The director, Mr. McCormack, referred to the continuing problems of staff attendance and overtime. Defendants' experts, all qualified professionals, testified that the use of critical numbers staffing for extended periods of time is harmful.

Critical minima were not always met. Two or three staff workers for 24–30 residents was a situation observed by several of the clients' relatives who testified. This low ratio was noted by some of the experts, including defendants' expert Hugh Sage, superintendent of a state developmental center in Nebraska, who asserted that there was not enough staff to provide even minimal care.

Staff absences and high turnover continue to be a significant problem. Floating staff, that is staff that is not assigned to the particular ward and is unfamiliar with the residents, must frequently be employed to make up the critical minimum. Use of floating staff is almost constant in some wards.

The effect of such transient workers can be dangerous, leading to situations in which floating staff, unfamiliar with a ward's residents, will mistakenly give medications intended for one client to another. Since floaters are usually unfamiliar with the ward's residents, client interaction and effective implementation of programming becomes more difficult and less likely to occur. As Margie Grant, a member of the Center's direct care staff for three and a half years, testified, floating

> is demoralizing, because you go on a ward where you don't know the clients, and they don't know you.... They get, like, hyper if you have floats.... The work is not kept up.

Use of floating staff makes it difficult to create an environment in which learning can occur. The practice generally undermines any possibility of effective programming or reinforcement of skills. Brian Len-

sink commented adversely on the use of floaters to make up the critical minimum:

> There is no way they will have the time to brief themselves on a plan if they can find a plan on what they should be doing with those residents.... There is no way that they [the critical minimum staff] can spend any time trying to stimulate or educate or train or even attend the residents when there are that many.

As noted, the mentally retarded have a greater need for consistency in the way they are taught. Brian Lensink explained that "the retarded person has a harder time picking it up in the first place, and could forget it much easier if it's not reinforced." Not only does this require residential reinforcement of what is taught at the day program, but it also necessitates consistency of staffing so that in carrying out the hands-on training by which many self-care skills are taught, hands are laid on in the same way. Floaters generally cannot work with the clients on reinforcement of the skills taught in the day programs because they are not familiar with those programs, or the goals and methodologies described in each client's developmental plan.

### (3) Inadequate Staff Training

Most programming is devised by clinicians such as psychiatrists, doctors, physical therapists, speech therapists and occupational therapists. Implementation, especially in the most basic areas—toileting, eating, washing and dressing—is largely the responsibility of the direct care staff. When direct care staff lacks the time, the familiarity with residents and the interest to effectively implement such programming, it cannot succeed.

An equally critical factor undermines staff efforts at programming, even among those who care about the clients for whom they are responsible and who would like to work with them. Simply put, many, if not most, direct care staff have not received sufficient training.

All newly-hired direct care staff at the Center now receive some 200 hours of class-

room orientation. That training, according to direct care worker Phyllis Killigrew, who recently received it, includes "very, very little" hands on training. Although she characterized her classwork as "adequate," she felt that it did not prepare her for the reality on the ward.

> Everything was not the way it was supposed to be. I wasn't able to do all the things that I was taught in orientation.... I was being frustrated at every turn. These people that I work with on ten-B—need a spokesman, someone to say that the quality of life and conditions on this ward—and I speak for this ward, are horrendous.

Margie Grant, another direct care staff person who spoke positively of the orientation, described it "like fantasy" compared to what she later found on the ward. Ms. Grant who has worked on Ward C, Building 28 for the last two years, and who has been at the Center for four years, testified that she had never been trained to teach residents to dress themselves, or to perform any other basic self-care skills. Judy Walker, the nursing program coordinator, agreed that the direct care staff has never been taught to institute toilet training programs.

Nor is there any requirement of in-service staff training, despite the defendants' seemingly impressive array of course offerings. *See* Suffolk Developmental Center 1981 Catalogue of Education and Training Programs. As the 1980 Bureau of Staff Development & Training Management Plan put it:

> Perhaps the major flaw in defining the legal basis of training is the total absence of a rational, comprehensive organizational policy regarding staff development. The policy directives cited in the report deal with two isolated issues. There is no written policy(s) regarding: (a) the scope of responsibility for training both at the central office and facility level, (b) the procedures and mechanisms to be utilized in order to properly carry out these responsibilities, and (c) the coordination of central office and local level activities for staff development. Such a

policy is essential and should be written.... The lack of a rational, overall OMRDD policy regarding staff development is an extremely unfortunate situation.

Only thirteen Center employees have actually availed themselves of in-service courses.

In any event, it is questionable whether an institution already as understaffed as the Center could actually spare its badly needed staff for in-service training. As Judy Walker commented:

> We are a big institution and we can't stop and freeze and say to a group of old employees and new employees we will take you out as a group and sit and train you.... Who is going to take care of the client?

For those members of the direct care staff who either received no training or were trained under the "medical model," using physiological therapy and designed to keep the client relatively passive, programming, intended to actively train the client for as normal a lifestyle as possible, may be an unfamiliar concept and, therefore, even more difficult to implement. Judy Walker who has trained therapy aides and the nursing staff for fifteen years at the Center noted:

> ... We have some problems with [staff training] ... We have therapy aides who have been with us a very long time—since we first opened.... We have a core of therapy aides who started out in the very beginning when we had this medical [model] knowledge.... I never trained them in this developmental model and then we have some who came halfway between when we were making the change. And we have some new therapy aides who come out of class fully convinced that the developmental model is the only one and they are right....

Mark Davis, Deputy Director for Treatment Services of the East Campus at the Center, admitted that it will take at least two more years to sufficiently train the staff in new methods of programming. Fred McCormack, the Director, similarly ac-

knowledged that staff attitudes, though improving, still have some way to go:

> They're doing more things for clients at this point. They're still not where they would like to be. There is more interaction. There's more expectation of people participating in programming. And they're beginning to do more things.... They're still not there.

### (4) Lack of Adequate Staff Supervision

The effect of inadequate staff training is intensified by a lack of adequate staff supervision. As a new staff member, Phyllis Killigrew testified:

> Q. Since the completion of your orientation, have you had additional training from any supervisor or anyone else at S.D.C.?
>
> A. Not really no.
>
> Q. What about supervision? Are you supervised by team leader or mid-level supervisor on a regular basis in the ward?
>
> A. No.
>
> Q. Are you shown what to do or told what to do?
>
> A. No.

This failure is probably due in part to the inadequate number of mid-level supervisors and clinicians. Like the direct care staff, clinicians' responsibilities are spread thin, leaving them little time for staff supervision and training. Maria Saracino, a direct care staff person in Building 28, Ward C, testified:

> Q. Do you have a supervisor that works with you on a regular basis in your ward?
>
> A. No....
>
> Q. How frequently would you say a team leader or therapist is with you ... on the ward?
>
> A. A few minutes maybe, on a given day; sometimes not that much.

### (5) Lack of Staff Familiarity With, or Access to, Individual Plans of Clients

When particular programs (DVPs) and strategies of goal-implementation have been devised for individual clients, many direct care staff workers are unaware of them. Expert Lyn Rucker testified that,

> When asking the direct care staff, what type of programmatic interventions ... were taking place, or if they had access in one particular case to a physical therapist, whether a person should be wearing the orthopedic shoes, the response in both those cases, it was, no; they did not have access and there were no programs.

And even when the staff did know that specific programs for certain clients existed, the programs were frequently inaccessible and thus of little value. Brian Lensink testified,

> [W]hen I was in the workshops I asked could I see a copy of the client's DVP so I knew what was supposed to be working in the workshop environment, and except for on a rare occasion they always said the DVP is in the residence and we don't have a copy of it here, and therefore you will have to go to the residence to find out what the person's goals were.
>
> Well, it didn't do very much good in the residence because a program that was being operated was in the workshop or the educational program...., but when I ask the direct care staff [in the residence], almost without exception they didn't know what the plans were anyway. If they did, they said they were carrying it on in the workshop. It was a very confusing process that seemed to be of little benefit to either location.

Staff that is not trained in programming cannot work with the clients to develop basic skills. This failure, in turn, increases the risk of harm to the client. Defendants' expert Richard Blanton testified that the implementation of programming for some clients "is a life or death matter." Without the necessary programming, clients may develop destructive behaviors. Rose Maggio's son, Michael, who was never provided a program to curb his pica behavior—an abnormal craving to eat non-foods—died from ingesting plastic gloves left around the ward. Without a staff that has been

trained and has the time to implement such programs, they cannot be implemented.

### b. *Inadequate Clinical Staff*

The inadequacy of the direct care staff training is in part explained by the fact that there is not enough clinical staff to train them. Both plaintiffs' and defendants' experts, as well as the clients' parents, agreed on the shortage of clinical staff, and particularly of physical, occupational, and speech therapists.

Based on interviews with staff, Kathleen Schwaninger testified that the shortage of physical and occupational therapists prevented many clients who needed various therapies from receiving them. Even defendants' expert, Hugh Sage, noted, "In some instances there were staff shortages and critical deficiencies in some kinds of disciplines."

Lyn Rucker never saw any doctors or therapists on the wards in visiting nine buildings over two days in August, 1982. Judy Walker, the head of nursing at the Center, stated that there is only one doctor on call for the entire Center at night; only two on weekends. For many years there was only one dentist. Only recently was a second dentist added to care for the 1,200 client population.

Anthony Mariano, a treatment team leader in Building 28, said there was an inadequate ratio of one psychiatrist for 82 clients in Building 28 and that no more had been requested. Despite this, the Director, Fred McCormack, acknowledged that there are immediate plans to terminate at least nine psychiatrists currently working at the Center. Lack of speech therapists is a serious problem. *See infra.*

### c. *Hiring Process*

Crucial to the staffing problems at the Center are the hiring administrative procedures and policies. These are devised by the state.

Funds for hiring become available in the following way: The Director of the Center submits a budget request to the Office of Mental Retardation and Developmental Disabilities in Albany which forwards that request as part of its own to the state legislature according to the testimony of Robert Norris, First Deputy Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities. Once the appropriations are made, the State Division of the Budget, which is part of the Governor's Office, has some control over expenditures according to testimony of Zygmond Slezak, Acting Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities.

Joseph Ryan, Deputy Director of the Center testified that the Center required more staff to maintain an acceptable level of care. He also admitted that there are areas which had no physical therapy staff. *See* Draft Policy Memorandum on "Physical Therapy Service—Evaluation Procedure," February 1982. Yet, according to Marvin Colson, Deputy Director of Institutional Administration, there is a hiring freeze in effect. Director Fred McCormack denied that during his tenure there has been a state-imposed hiring freeze—he referred to the situation as a restriction on hiring he has imposed himself. The effect, however, is the same as a freeze since the purpose of Mr. McCormack's restriction is to avoid the state bureaucracy's penalties for overstepping stringent and apparently inadequate state staffing ratios.

> We haven't been able to hire.... I impose it—very simply the reason for imposing it, the freeze, was that if you go over two pay periods in a row over your authorized staffing basis of 1.78, you get a Division of Budget freeze enforced. And I'd rather have my own restrictions on hiring than have to go through the tremendous bureaucratic procedure to overcome that.

### 2. *Programming*

As already indicated, it is generally accepted among professionals in the field that constant and consistently reinforced programming is necessary for the mentally retarded to acquire those self-care skills es-

sential to the most basic kind of development and human interaction. The clients' lack of long-term memory requires constant practice of skills in the ward residential setting as well as in the more structured educational sessions. Consistency must be maintained seven days a week, twelve months a year. Every staff and professional person must work towards defined behavior goals if habit patterns are to be formed.

The formal aspect of client education and training is mandated by state law. In New York, all clients in state institutions for the mentally retarded are entitled to six full hours of formal programming a day, unless they are specifically designated as medically exempt. There are between 20 and 50 medical exemptions among the approximately 1,200 clients currently at the Center.

Clients under age 21 must be provided "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." Education of the Handicapped Act, 20 U.S.C. § 1400(c) (Supp.1983). *See Sherry v. New York State Education Department,* 479 F.Supp. 1328, 1335 (W.D.N.Y.1979). *See also* Section 504 of Rehabilitation Act of 1973, 29 U.S.C. § 794. At the Center 135 of those clients under age 21 go to countywide programs for the disabled in the local Half Hollow School District. 94 clients under age 21 cannot go off the grounds for programs.

The majority of Center clients are over age 21 and rely on the Center to place them in programs either on or off the grounds. The stated goal of the administration is to get all of the clients out of their wards and into a different environment for programming. Yet more than 300 clients remain in their wards during the day as well as at night.

Whatever the goals of the institution and the requirements of law, programming at the Center falls short. Margie Grant testified that in Building 28, Ward C, where she works, approximately 14 (out of 20) clients that do not leave the building for programming receive no program at all. Brian Len-

sink said that he saw no programs in any of the residential units. He noted that the direct care staff with whom such residents remain on the wards, as well as those who accompany the residents to their on-ground programs in other buildings, are not trained in educational programming.

Both on and off the wards, there are simply not enough programs to accommodate all of the residents. Such programming was not available to all residents of the Center in 1978 when this lawsuit began. It is not available to all the residents today.

Half of the adult residents were not getting six hours per day, on or off campus, in 1980. Half were not getting six hours when the trial began—unless they were members of the "Willowbrook class." In March 1982, including those involved in the central workshop program, "satellite" workshops, the Building 9 educational and workshop programs, and the living unit classrooms, fewer than 400 of the 1,000 adult residents were participating in any formal program at the facility.

Perhaps 70 to 100 adults went off-campus for day programming. While this practice is recognized as desirable in itself and as preparation for community living, opportunities for such programming are rare in part because of the facility's transportation problems. A lack of community resources also contributes to off-campus programming failures.

Parents and relatives who testified unanimously indicated that once their children or siblings passed the age of public school eligibility (if not before), any programming they received was sporadic, inconsistent, and therefore ineffective. What little these clients did receive was often due to their families' efforts, not the institution's. Several parents used their own or client's funds to hire a tutor to work with the residents.

Resident Laura Knapp went without a program for five years after reaching the age of 21, until suddenly being enrolled in a workshop during the trial. Additionally, she pays for a tutor out of her own funds.

In some cases, the Center, as representative payee for the client's Supplemental Security Income or other benefits, makes the decision to use client funds for tutoring programs. When the client or his or her family lacks the funds, no tutor is available.

There is no objection to stretching the institution's resources with private funds. But those without funds or caring relatives cannot be denied programming. Differences in affluence which may be acceptable in an open society create severe inequities when imposed on those confined to institutions, with no power or capacity to aid themselves. This is neither equality in fact nor equality of opportunity.

The quality of existing formal programs at the Center may be described as uneven to inadequate. For example, Dr. Clements saw a program in Building 3 in March 1982, in which six staff tried to work with 21 residents in an atmosphere of noise and confusion, using reinforcement techniques that might have been appropriate for some of the clients but certainly not for all of them. It could not be immediately determined which approaches would be appropriate for which clients, since the relevant plans and records were inaccessible. The Building 3 activities observed by Dr. Clements were examples of group exercises, not the individually designed programs that the clients needed.

In the Building 16 units, housing "acute" and "chronic" clients, the written program for most consisted of physical therapy. The staff was said to be trained in physical therapy techniques, but when asked for a demonstration, it evinced no familiarity with proper procedure.

The experts agreed that in too many cases the lack of programming has resulted in injury to the clients.

a. *Toileting*

Both plaintiffs' and defendants' experts testified to the overwhelming need for toileting programs. Brian Lensink saw no toilet training programs during his five days of visits to the Center in February and September, 1982. Lyn Rucker was surprised by the great number of individuals in diapers. Marian Ball testified that while she was at the Center many of those who required toileting programs did not receive them.

The Center's "Daily In Patient Census Summary," dated March 5, 1982, shows that of the approximately 1,200 clients, 800 were in need of, and not receiving, toileting programs. Phyllis Killigrew, a member of the direct care staff, testified that she never knew of any "official" toileting programs. When toileting programs did exist, they were implemented sporadically and without the accompanying reinforcement on the ward necessary for them to be effective. The graphic testimony of parents confirms this failure.

The case of Dennis Silverman illustrates the need for consistent, continued training. He is a 37 year old resident of Building 16, who has gone to a community day program for seven years. He is trained to tell someone when he needs the toilet, and does tell someone at the day program. Yet there is often no one on the ward to hear him so he wets himself. Recently, his parents in an evening visit found Dennis, wet, near the nurses' station, "sitting on a bed of cockroaches." Silverman's situation is thus not much better than that of Tommy Czerniewicz, and others who have never been in any toileting program. Ironically, the widespread implementation of toilet training would benefit the staff, as well as the clients, since it would free them from some of the housekeeping tasks they must now engage in, and give them more time to work with clients.

Skills once acquired are lost at the Center. Several parents testified that clients who were continent at the time they were admitted lost control during the course of their continued residence at the Center.

b. *Behavior Modification*

Behavior modification programs at the Center for the large number of clients who require them are inadequate. In 1978, Edward Jennings found that provision of be-

havior modification programs for residents "was grossly inadequate." He agreed that the absence of such programs, particularly for those residents with self-abusive and self-stimulating behaviors "could be very injurious."

Marian Ball testified that not all of those who required behavior modification programs received them, and that because programming was insufficient, drugs were often used to control behavior. Barbara Karp, who has been at the Center since 1972, never received any programming for her hair-pulling and head-banging. Instead, in her mother's words, she was given "more and more drugs" and thus "is, to this day, addicted to valium, and they could not take her off it because she had such tremors you could not touch this child."

According to defendants' expert Richard Blanton, who is responsible for residential programs for the developmentally disabled in Illinois, without adequate training clients can easily develop or aggravate harmful behaviors. That consistent and reinforced programming is, in fact, crucial, is made plain by the death, already adverted to, of Rose Maggio's son, Michael, one of a number of Center residents who demonstrated pica behavior. Michael was not consistently trained to avoid eating foreign objects.

Kathleen Schwaninger testified that the Center was not providing sufficient training for those with self-abusive behavior. Often the staff did not even interrupt the clients' negative behaviors. Janet Stutz, who screams and bangs her chin, has never received any programming for either behavior. Lisa Gorelick has lost all sight in one eye due to a cataract caused by head-banging.

A few clients identified as having behavior problems that would be likely to result in harm to themselves and to other clients, have a direct care staff worker assigned to them on a one-to-one basis. Incredibly, staff assigned to this one-to-one duty may not know of the specific behavior problems of their clients; rarely are they informed of any program designed to overcome the problem.

Julie Mary Dean, who throws chairs and otherwise acts in a disruptive manner, has a staff member assigned to her on a one-to-one basis. Expert Brian Lensink testified:

I asked her [the one-to-one] what her responsibility was and she said it is to— she is supposed to stop the behavior.

She was not trained in how to work with Julie May. She did not know what she was to do for sure other than she was to stop that obnoxious behavior. . . . Even though [Julie] was assigned to the day program her behavior was too obnoxious to allow her to attend and when she did attend [the direct-care staff] didn't know what she did. . . . It is injurious in that she is not getting the training or the benefit in relation to the expenditure that is being made.

The testimony of Maria Saracino, a member of the direct care staff in Building 28, Ward C, confirmed the dangers to clients created by lack of programming and failure to train staff:

We have two particular clients that have been constant behavior problems. . . . They have to be under very constant supervision because they are hitters, they're scratchers, they are biters. . . . they have caused a problem on the ward, because our other clients are . . . small in stature, and unable to defend themselves against them. . . . We have repeatedly, every single day, brought this to the attention of the doctor, the nurse, the team leader, the chief of service. . . . Quite often the other clients are bitten to a point that the skin is broken and they have received a bad bruise.

They are hit against the wall or knocked off a chair where they are badly bruised.

They have been scratched where the skin has been opened up, and badly hurt in that manner. . . . Because we have brought it to the attention of the psychologist and the previous team leader, a program was begun to be worked out.

It did not come about because we had a change of team leader, and it has not been yet activated. . . .

Q Were you folks trained in how to implement what was written on paper?
A No. We were not.

Lyn Rucker found that staff "were not aware of any active programming going on to eliminate those [self-abusive] behaviors."

Even for those clients who began without them, lack of programming may lead to behavior problems according to testimony of Brian Lensink. Direct care staff person Elle Ambrose acknowledged that Russell Cohen is not self-abusive when he is kept occupied. Many clients have developed harmful or inappropriate habits, such as head-banging, eye-gouging and biting themselves, which may be caused by boredom, and an unstimulating environment.

The environment of a large institution may exacerbate dangerous behavior because of an "inability to provide enough attention to people and the way people get the attention they seek is acting out behaviors ...," according to Kathleen Schwaninger. Moreover, clients will pick up each other's inappropriate behaviors in order to receive attention that would otherwise not be forthcoming. Thus, the failure to provide a behavior modification or other program for one client with negative behavior, may encourage the acquisition of such behavior by other clients.

Practically every parent or relative that testified described the serious injuries they found when visiting. For example, Lisa Gorelick, said her mother,

has had two broken collarbones, she has had one broken finger when the residents slammed the door on her finger, and she had another finger injury.... She was once bitten on the buttocks when the children were showered in an assembly line fashion and she was through being showered.... She has had black eyes, she almost always has bruises on her forehead from banging her head....

When Donald Fearing visits the Center, he checks his son's body.

I have found that invariably he is scratched from head to foot.... He ... had a terrible wound on his elbow.... he had a broken nose twice.... He has had at least six injuries ... requiring stitches ... mainly around his head area.... [as a result of] personal attacks by another resident.

Barbara Karp's mother reported Barbara has

suffered a broken upper arm.... She has had head injuries, she has had stitches on her head and forehead, scratches around the eyes, bleeding from the ear.... and bites.

Before Michael Maggio died he had a fractured wrist, and many bites on his body. Once Mr. and Mrs. Maggio saw their son naked, being choked by another boy as an attendant sat by and watched.

The scene of Nicolina Coster being beaten by a resident while the person on duty watched television has already been described. Nicolina was again hit by a resident the following month. When Mrs. Moses went to see her sister two days later,

Her face was covered with black and blue marks. Her chest, upper chest and her back were black and blue. Her front tooth was missing.... She was pulling the hair out of her head.

As I came in, she jumped up in the seat and she said, "Help me, help me. Please help me." She was also doing that to one of the other workers.

Her leg was ... as big as my entire body. A worker told me that she had not slept since the beating....

Since then, Nicolina has also had her nose broken.

Robert Stutz, who "was constantly being pushed and shoved," has had 31 stitches over his eyes, and now "has so much scar tissue here, that he has lumps over his eyes...." Thus, the result of the lack of appropriate programming is that many clients, whose negative behaviors harm both themselves and other clients, live in an environment that cannot protect them from harm.

Even when a good program is begun it often ends abruptly when funds for person-

nel are cut back. Where programs do exist, they are often sporadic; they have "started and ended rather abruptly."

### c. *Feeding*

Equally crucial to safeguarding the life of a client are feeding programs in which appropriate chewing and swallowing behaviors are taught. Without such programs, there is an increased probability that clients will choke. This risk is increased by staff feeding supine clients. When Kathleen Schwaninger visited Wards 3–A and B of Building 16,

> Staff were not stimulating any swallowing or chewing techniques with clients. They were putting the food in the clients mouths.

> One client was being fed in a supine position and that is significantly inappropriate for a client with these types of physically disabling conditions.... A person is flat on their back, and if they do not swallow or have trouble swallowing they begin choking on their food.... A client can aspirate and die, choke and die.... What happens is that either the food doesn't go down or the food goes partially down or the food comes back up and starts getting in the client's breathing apparatus.... It leads to choking, it leads to the client not being able to get oxygen to breathe.

Neither did Lyn Rucker see any active feeding programs.

There are not enough feeding programs being carried out at the Center. Even in Building 9, one of the buildings specially reconverted for use for education, Kathleen Schwaninger found that mealtimes are not learning experiences. She observed one exception in which a teacher was working with one client during lunch in the school building to overcome food-grabbing and food-shoveling behaviors. When this same client was observed eating in her residence, Building 26, however, she grabbed and shoveled. Inappropriate eating behaviors are not interrupted by the staff. Without coordination on the ward, the school program is practically meaningless.

There is only one family style eating program at the Center. It involves seventeen clients in Building 2. Only in a few of the buildings do the clients eat off plates. Plates and silverware were first used in Building 30, which houses high-functioning residents, only about a year ago. Most Center residents are fed from compartmentalized trays in which the various foods are often mixed.

### d. *Speech Therapy*

There are insufficient speech therapy programs at the Center. Neither Robert nor Janet Stutz has ever had any speech therapy. Janet screams, though she is not verbal. Robert has also tried unsuccessfully to communicate. Though Robert is ambulatory, and "can walk perfectly by himself," he spends much of his time sitting, locked into a chair, with a restraining lapboard, in the dayroom of Building 14, Ward 3. As his parent testified:

Q Is there any reason that you know of why Robert ought to be locked into a chair?

A None.... Robert is not verbal but at one time in another ward he picked up his entire chair and put it on his back and proceeded to walk with it on his back. He was trying to tell the staff there I want to get out of his chair but who listened. When I walked in a couple of days later they said to me the first thing —"You know what you son did?" "No, what?" "He picked up the chair and walked around with it on his back."

I said, "Well, he is trying to give you a message, that he wanted to get out of that chair."

Barbara Karp, a resident since 1969, has never received any speech therapy. When her mother specifically requested it for her, she was told "there were very few therapists."

Because of the environment and lack of training, speech skills formerly acquired are lost. Tommy Czerniewicz, who was able to talk and sing before he was institutionalized, now "is virtually mute," in the words

of his father. In the thirteen years that Tommy has lived at the Center he received no training of any sort until two weeks before his father testified at the trial.

When Dennis Silverman was admitted to the Center he could speak. Nevertheless he was placed in a ward in Building 15 with non-verbal residents. His speech ability declined markedly during the six or seven years he lived there. His mother testified that the doctor in that ward did not even know Dennis could speak.

> He was in an area where nobody spoke or said anything and had no reason to talk.

> One day I came into Building 15 and I greeted all the men and I said good morning boys and my child came forward and I said good morning Dennis and he said good morning mommy.

> And a doctor said to me, Mrs. Silverman, I didn't know he knew how to speak.

> And I said, Doctor, if you said good morning or good night you might know who could speak in this ward.

Donald Fearing who can speak single words, had speech therapy for an hour once or twice a week—not enough, according to his father, to lead to any improvement in his speech. That his speech has now improved is due to Donald's work with a private tutor, paid for out of his social security money, and arranged for by his father. Mr. Fearing believes that Donald's behavior problems are due to "his inability to express himself adequately." With sufficient speech therapy or training in communication skills, this father believes many of his son's problems would be alleviated.

Thomas Amorillo, the Chief of Speech and Hearing at the Center, conceded that while 600 clients are presently in speech therapy, not all of those who require this work are receiving it. Amorillo acknowledged that a lack of communication skills may make a client appear to be less capable than he or she really is. The result is reduced expectations and less attention to the client.

The absence of work on speech of clients is undoubtedly due in part to the lack of therapists at the Center. From 1976 to 1979 when Mr. Amorillo was a staff speech therapist in Building 23, there were generally two speech therapists for about 98 clients. As the Chief, Mr. Amorillo now supervises 28 speech pathologists for a client population of 1,200—not a significantly different ratio. At the time he testified Amorillo acknowledged there were two vacancies for speech pathologists at the Center, for which he was trying to obtain an exemption from the hiring freeze.

The lack of enough clinically trained staff adversely affects the clients, who are denied the therapy and evaluation they require. It also has a negative impact on the direct care staff, who "are primarily responsible for the implementation" of speech programs; they are denied the training they need.

e. *Physical Therapy*

Physical therapy programs are inadequate. Edward Jennings recalled that in 1978 very few residents were receiving required positioning, necessary to the maintenance of body flexibility for those with severe muscular problems. Generally, without such positioning or other physical therapy, muscle problems become worse. As expert Brian Lensink put it:

> Well, if you have a physical disability and you are sat on a mat, hopefully on a mat, many other times on the floor of a cottage with 30 other people who have the same disabilities with one or two staff persons, with no orientation to training, . . . there is no way to exercise and to stimulate those limbs in order to prevent the atrophy and the contractures which will become more and more severe the older that person gets. . . . [I]f you take that same child and you start moving those limbs every single day on a regular routine basis, and you start moving the joints and you start getting that person to start standing up and straighten their spine and using the limbs . . . you don't need to have those kinds of

crippling disabilities that occur from neglect.

Now, once a person has already established that severe handicap it becomes exceedingly difficult to try to correct it. They can be improved over a period of time, but it is very unlikely that it will be corrected.

Both plaintiffs' and defendants' experts reported on the shortage of physical therapists. Hugh Sage, one of the defendants' experts, specifically mentioned the "critical deficiency" of physical therapists. He noted that the physical therapy treatment activities at the Center met neither minimal federal standards nor current professional standards. Dr. Sage warned,

that the existence of those deficiencies, were they not to be corrected, would have the effect of preventing the development of more normal behavior. . . . I do concede that it probably would prevent the development of a good deal of human behavior which . . . the standards required.

Kathleen Schwaninger also observed many clients in need of physical and occupational therapy; she attributed the fact that they were not receiving treatment to the shortage of physical therapy staff. Joseph Ryan, the Deputy Director of the Center, acknowledged the difficulty the Center has had in recruiting physical therapists. He cited that problem as the explanation for the numerous deficiencies in physical therapy found by various survey teams. Responding to this deficiency, the Center drafted a policy memorandum, dated February 1982; it has not alleviated the situation.

The impact of the lack of physical therapy and physical therapists on some clients has been disastrous. For example, Dennis Silverman who could walk before he was institutionalized had to have major surgery to release one of his legs. Following the operation, his doctor ordered certain postoperative physical exercises to enable Dennis to move his legs performed at the Center. That therapy was never provided and Dennis' legs remain paralyzed.

Lyn Rucker saw no physical therapists at all in her tour of the Center. She was told of a formerly ambulatory resident whose hip was not pinned properly following a fracture, and for whom neither corrective surgery nor therapy was planned. She also mentioned Audrey Rothstein, a resident of Building 26, for whom orthopedic shoes had been prescribed to enable her to walk. However,

The indication from the staff, is that she did not have her orthopedic shoes on, for her mother had purchased the shoes for her at a cost of $300, and since she is not toilet trained, she did not have the shoes on because otherwise she would get the shoes messy. She was barefoot.

I asked, wasn't it the opinion of the physical therapist, that she be wearing shoes at all times. The indication was that she did not have a physical therapist. They did not know whether she should be wearing them all the time or not. . . .

Another client, Barbara S., who had been mistakenly identified as non-ambulatory, spent 13 years in a wheelchair at the Center without any therapeutic intervention, before she began to learn to walk again. As a result, she has suffered "significant muscular atrophy."

Several parents testified to the deterioration in their children's ability to walk. Russell Cohen, Tommy Czerniewicz and Susan Feibusch, who were ambulatory, were placed for a time in non-ambulatory wards. For Tommy, this "meant that he was indoors all of the time and had absolutely nothing to do. He was virtually a prisoner." Although Lisa Gorelick

walked into Suffolk Developmental Center fifteen and a half years ago with straight legs, she now is walking on bent legs, unless she has on a pair of full-length braces which [her mother] never sees her wearing.

Restraints which prevent walking reduce the need for supervision, and allow the small number of staff to be spread more thinly. According to mental health therapy and Phyllis Killigrew, staff

feel it is easier to have a child in a wheel chair [than] running around, because they are going to hurt themselves, because the biggest thing in the institution [is] that the child should never get hurt, because they don't want to explain how it happened.

### f. Education

### (1) Prevocational and Workshop

Vocational habilitation consists of training clients, by stages, to perform work requiring simple skills. During its visits, the Court was struck by the marked improvement of the Center's vocational program between the time of the Court's first visit in November 1978 and in its later visits in February 1983. At trial, however, several experts emphasized continuing substantial deficiencies in the vocational programs.

Some problems are attributable to conditions at the Center. Many, it seems, result from a lack of client workshop facilities in the Long Island community.

As described by staff members and visiting experts and as seen by the Court in its later visits to the Center, the vocational program is divided into phases of increasing ability levels. A multi-handicapped client may begin with pre-vocational skill training taught in Buildings 4 and 9. This consists of socialization, body awareness, color discrimination, and various tabletop learning games. Clients who have attained simple skills in packaging materials are placed in an upper pre-vocational program, such as that conducted in Building 20.

More advanced clients are placed in workshop programs in Building 17 and various satellite workshops around the campus. In these workshops the clients perform assembly and packaging of materials under contracts with private industry. The tasks require from one to six simple and repetitive operations. For example, one contract consisted of putting face sheets on the cover of notebook binders and then boxing the binders for shipment. Another contract had clients assembling ball point pens for a hotel chain. Clients doing this kind of relatively advanced work earn token piece-work wages.

The goal of the workshop program at the Center is to train clients for placement in community workshops. Community workshops are operated by private not-for-profit organizations and perform contract work for private industry. The community workshops are subsidized both by the contract work and by the state Office of Mental Retardation and Developmental Disabilities. To a greater degree than the Center these outside workshops are production oriented. In these shops clients earn income according to their production output.

Expert Brian Lensink on his visit to the Building 20 program in the summer of 1982 noted "a terrible shortage of work.... The clients were sitting at the table without any work waiting for something...." At no time did the staff member present leave his desk or otherwise interact with the clients. Lensink was therefore skeptical when staff members told him that they had little time to teach work skills because of the pressure to get work out.

Laura Knapp, an impressively articulate young woman with cerebral palsy who lives at the Center, testified that her program began only two weeks prior to her testimony and consisted of three hours a day, though "on and off," of placing nuts and bolts in plastic bags. For someone like Ms. Knapp, who plainly should be living in the community, such a program is unquestionably insufficient and fails to develop her potential.

A serious continuing problem is the lack of community workshops and the restrictive eligibility criteria of those that do exist. The paucity of workshops in the community forces Center residents to remain in the Center. Some clients residing in the community must return to the Center workshops for their day programs, an undesirable situation. The back-up extends down the line to the prevocational programs, where the clients who are ready to move on to the workshops must remain due to the lack of openings. The result is that at every level there are some clients engaged

in inappropriate vocational activity in inapposite settings.

The lack of community facilities has been attributed in part to the opposition of Nassau and Suffolk county officials. Commissioner Slezak testified that these officials refused to give approval to various workshop and residential proposals made by voluntary agencies, pursuant to state regulatory procedures. *See* 14 N.Y.C.R.R. §§ 51, 53. The director of the Young Adult Institute, a private agency with extensive experience in serving New York City clients with severe handicaps and behavior problems, testified to the opposition of defendants and other community agencies in Nassau when his organization attempted to establish day and residential programs on Long Island.

A problem with the existing community workshops is apparently that, with their orientation towards production, they will not accept clients who may need major training in order to work or who may exhibit inappropriate behavior. By contrast the Center workshops are able to provide some training and deal with behavioral problems and still get some work out. Expert Kathleen Schwaninger criticized the private agencies and the state office that funds them for not having the community workshops assume more responsibility for education and training. The court is not in a position to evaluate these criticisms since the focus of the suit was the Center. Much good work is done in community workshops and other institutions operated by private agencies.

The vocational program as it is currently conducted at the Center is a positive and hopeful sign, indicative of the improvements that can be implemented at the Center with a dedicated leadership and staff. It also demonstrates how some of the problems in developing community resources may possibly be traced to parochial attitudes and economic and social circumstances in the Long Island community as a whole, not just to the deficiencies at the Center.

(2) *School*

Building 9 houses an on-grounds school program, with 18 classrooms, that serves about 165 clients—most of whom are over age 21, and therefore no longer eligible for the local public school county-wide program. The building is divided into two wings, with a gymnasium in the center. The clients are grouped by functioning level, so that, in Kathleen Schwaninger's words,

One wing houses classrooms for lower functioning clients with emphasis on social skills, training, eating, developing eating skills, developing personal care skills, learning how to dress, comb the hair, wash their hands, go to the bathroom, brush their teeth.

Wing B individuals [are a] higher-functioning group of clients, including three vocational and prevocational clients.

A similar program in Building 21 serves 110 clients.

One hundred thirty five Center residents, all under age 21, attend public school programs. 35 Center residents attend community day programs operated by United Cerebral Palsy and the Association for the Help of Retarded Children.

Building 4 opened as a program building on September 15, 1982—while this trial was in progress. It serves primarily profoundly retarded, multiply handicapped individuals. The program there, as described by Rosalind Burke, Deputy Director of Treatment Services at the Center,

varies with the different groups. From my multi-handicapped group, who are non-ambulatory, we would [do] primarily prevocational skilled training. We do socialization, body awareness, color discrimination. We are also incorporating into this program, this task for these clients. Some of them ... are not transported, they go by themselves with a staff member with them to the building four program. This means crossing the road.

So what we have been trying to do and we are in the process of establishing goals for training so they will learn to look both ways when crossing the road, watch

out for traffic. We are working on a signal being placed in that area so they can be aware of stop signs, etc.

Despite the defendants' belief that all residents ought to leave their residential buildings for programming because "a change in environment is good for everybody," more than 300 clients, particularly those in wheelchairs, continue to receive their training, if any, in the same buildings in which they live. The experts testified that the educational programs do not accommodate all of the residents who should attend them. Some of the classrooms, particularly those for clients with orthopedic equipment, in the medical-surgical building, are neither large enough nor adequately equipped with appropriate teaching materials to effectively accomplish the teaching intended. Kathleen Schwaninger reported only short teaching schedules in inadequately furnished classrooms:

There is not room in those classrooms for the respective teachers to be able to take the clients out of their orthopedic equipment and work with them in a motor-development kind of way.

It is crowded .... [I]n each classroom the way the clients were being worked with was by the teacher placing a different kind of toy or material in front of the clients and then rotating from client to client and working with—in working with that particular toy.

A second classroom had been set up within the three weeks previous to my visit.

That classroom was barren. It was bare. The teacher really didn't have an adequate supply of materials at all.

The teacher didn't have a desk.... It is a very limited period of time. It is only approximately an hour. There are not enough materials.

The teachers are really to be commended for their commitment. They really want to work with the clients and do something for them.

But, ... the teacher, himself, responds to a barren environment.... And the clients are not provided with stimulation.

Neither the school program nor the workshops or prevocational programs provide the full six hour complement of programming, accepted as standard by professionals in the mental retardation field. Yet Brian Lensink pointed out that eight hours is the accepted standard for workshop programs.

Brian Lensink testified that Richie, one of the workshop participants in Building 9, could have received at best a maximum program day of "five hours and that was not every day." In Building 9, the program day ends at two o'clock, though it is scheduled to end at three o'clock. Ms. Schwaninger testified that other clients in Building 10 could be receiving no more than 2–3½ hours of schooling.

Programs do not operate over the summer. This, said Kathleen Schwaninger, results in clients losing "skills they possess when school lets out in May, ... [so] when the students come back in the fall, there is a significant period of time spent in recapping what the clients had when they left the classroom program." The summer hiatus is apparently due, at least in part, to a bureaucratic entanglement which would require teachers—who work only during the school year—in the educational program to be reclassified as Developmental Disability Specialists in order to work during the summer.

### g. *Deaf and Blind Clients*

The Center has no special programs for deaf and blind clients. Staff members testified that they are badly needed.

### 3. *Individual Developmental Plans*

Center policy as well as federal and state law requires that a written individualized treatment plan setting forth determined goals, with specific programs and therapies to achieve those goals, be developed and maintained, with current records of progress, for each client. An adequately detailed and up-to-date developmental plan is crucial. It is the means by which staff learn what programs have been specifically

designed for each client, and how those programs are to be implemented.

In the prior discussions of "staffing" and "programming," failures were traced in part to lack of programs, lack of staff familiarity with what programs did exist, and inadequate staff training in the implementation of programs. Additionally, the inadequate programming at the Center may be attributed to the deficient condition of many individual plans. Of the 32 plans that Brian Lensink randomly examined during his visit to the Center, none reflected the client's specific or important needs. For example, in September 1982, Mr. Lensink reviewed Russell Cohen's plan and found a goal that stated "Russell will not imbibe any unusual liquids from 6/4/82 to 12/4/82." When he mentioned it to the staff, no one knew of any unusual liquids Russell was imbibing. In many of the plans, the goals had not been adequately documented, and were out of date.

Often, the goals were broadly stated and poorly described, so that they were of no use to the direct care staff charged with carrying them out. Lensink found percentage goals, though the staff had no means of measuring them. The same goals, on xeroxed forms, were used for many clients even when this uniformity appeared to be inappropriate. In Lensink's view, identical plans did not "appear to be the best way to establish individualized goals."

Many of the individual treatment plans at the Center are useless. In the case of Richie S., for instance, Brian Lensink found that

> There really was no program in the [Individual Developmental Plan]. There was lots of papers but no specific program to be worked on. There was no program information available to the [Direct Care Staff person] to follow.

Though Richie's school teacher had written goals for him they "were kept in a file cabinet in the school and they were not going to the residence and they were not in the plan." The plans are often descriptive of staff activity rather than client achievement. For example, a typical statement is:

"will receive individual care with respect to bathing, feeding, dressing, to maximize health and comfort," with no indication of how these general goals were to be accomplished. Even the widely used "canned" plans introduced at trial by defendants contained goals that were vague, non-behavioral, unmeasurable, and stated in a negative manner—all contrary to the Center's own training manual.

Very few individual development plans, moreover, set forth step-by-step procedures for the staff to follow; they are written so broadly and generally that the staff cannot tell what to do. The result is an enormous amount of paper, but not a specific program for the client focused on his or her most important needs. Thus, defendants' ambitious goal plan for correction of one client's "pica" behavior turned out to be nothing but a goal—the necessary baseline information had never been compiled because of a lack of staff. There were no instructions to the staff as to when various activities should occur, and in fact, the plan had never been implemented.

Federally mandated independent peer reviews of the Center, including that of May 1982, have consistently criticized the institution's deficiencies in program evaluation, documentation, and record-keeping. The most recent survey found that half of the psychological evaluations of Building 28 residents had not been updated. Both the State's own expert, Dr. Hugh Sage, and Joseph Ryan, the Deputy Director of the Center, agreed that adequate documentation was lacking.

The most serious problem with the Center's developmental plans is that almost nobody uses them for their intended purpose. As noted above, the plans are inaccessible to the staff who might make use of them. Almost invariably, when plaintiffs' experts asked employees about the plans for clients in their charge, the staff was unaware of the goals and methods they supposedly contained. As mental health therapy aid Margie Grant explained, even those employees who are aware of the clients' goals are generally so busy with other duties that

they have no time to work on them. The plans, however good or bad they are, are almost never implemented or even understood by staff.

This widespread failure to make use of individual development plans is harmful to the clients. The experts agreed that the resulting lack of consistent clues and responses from all staff confuses the clients and inhibits their learning.

### 4. Environmental Conditions

#### a. Wards

There are 25 residential buildings at the Center. Aside from the smaller cottages which house higher-functioning clients, they are generally divided into wards of 18 to 25 clients. Each has a dormitory or bedroom area, often kept locked during the day, a dayroom, and a dining area.

In order to comply with federal requirements, necessary to continued receipt of federal funds, some of the larger dayrooms have been subdivided to function as residential sleeping areas, as well as dayrooms. Partial dividers have been used to separate the dayroom area from eight-bed groupings. This increases the square footage per client bedroom space, and conforms to the eight-bed federal limitation on residential groupings of clients.

When Fred McCormack assumed the post of Director in August 1981, he closed three buildings that had been residences because they were not suitable—the last in May, 1982.

Over and over, the same words appear in the trial record to describe the environment in which residents must live: barren, unstimulating, empty, prison-like, and harmful. These observations were made by experts, parents, and some of Center's own direct-care staff about every residential building throughout 1982, and earlier.

Residents spend many hours in large dayrooms with few furnishings, toys, personal belongings or decorations. They wander, sit, rock or lie on hard uncarpeted terrazzo floors which magnify the din caused by constantly blaring television sets, radios, and record players, often all going at once.

The painfully high noise level frustrates any effort that might be made at communication. Toys and the like are rarely in evidence because of the overextended staff's fear that some residents would take them apart and perhaps try to eat them.

The dayrooms are usually sparsely furnished, with few, if any chairs. Furniture where available is usually inappropriate. For example, in its visit of February 21, 1983, the court observed metal furniture, with sharp edges, used to separate part of a dayroom in Building 11 that had been converted to a bedroom in order to meet federal requirements.

Almost without exception, the doors are locked to buildings, to dayrooms within the buildings, to bathrooms, and to sleeping areas. Thus clients cannot go to the bathroom on their own, even if they are otherwise able to. They cannot relax on their own bed or escape from the tumult of the dayroom. There simply is not enough staff available on the living units to supervise the clients in more than one place at a time.

In the bathrooms the toilets often lack partitions between them, as well as toilet paper, towels and soap. And in adult wards, the sinks are designed for use by children, so that the residents cannot be taught how to use them. In the East Campus, there are no bathtubs in the residential buildings. Many clients are subjected to congregate or "gang" showers because of the shortage of staff.

Several of defendants' witnesses, including Dr. Stanley Slawinsky, Deputy Director for Quality Assurance at the Center, admitted that the situation is not satisfactory. Dr. Richard Blanton, one of defendants' experts commented that, "[a] lot of doors need to be unlocked, a lot of normalized things need to happen at Suffolk ..." And Laurie Schwartz, a Speech Pathologist Supervisor at the Center, agreed that it is inappropriate for both the television set and record player to be on at the same time.

Other witnesses testifying for the defendants acknowledged the constant problems with vermin. There was a serious rodent infestation noted by the survey team in its May 1982 inspection. Such problems continue today.

Some units are not cooled in summer and the hot sun beating down on the unshaded brick buildings raises the temperature to a dangerous level. By contrast, in the winter, the heat in some buildings is insufficient, creating special problems for poorly clothed clients sitting on the terrazzo floors.

The most recent independent survey of the Center contained 19 pages of life safety code violations and 58 pages of related environmental, maintenance, sanitation, safety, and programmatic violations. Included were such problems as timely completion of only 18% of scheduled preventive maintenance. The facility's performance on this review, conducted by the State Office of Health Systems Management, was a slight improvement over the 64 pages of deficiencies in October, 1981, and was considerably better than the 99 pages in the 1980 survey.

Plaintiffs' witnesses concluded that physical conditions alone rendered the Center an unsafe environment for some of its residents. Dr. Hugh Sage, one of the defendants' experts, testified that, while in his opinion "overall SDC met minimum requirements," the "substantial physical deficiencies" kept the residences from meeting certain federal standards, to the extent of preventing the clients' development of more normal behavior. He testified that conditions at the Center have the potential to be detrimental. Sage noted that the Center has been denied accreditation by several boards. While another of defendants' witnesses concluded that Center is safe, he did note the risk of harm to which it exposed clients in wheelchairs.

The aspect of the Center's ward environment that was agreed upon by both plaintiffs' and defendants' witnesses was the general idleness and lack of human interaction already referred to which permeates the dayroom areas.

Parents consistently testified that clients are herded together in groups of twenty or more, with two or three staff at a time who pay little attention to the residents. They are rarely allowed to go out of doors, even on weekends when the weather is good and there is nothing else to do. Particularly for those who remain in the wards all day, the lack of the ability to go outside their locked buildings compounds the effect of the bleak and barren wards.

### b. Lack of Personal Belongings

Several parents and relatives of clients, regular visitors to the Center, testified that they had never observed any clients' personal belongings, either with the client or in the client's private chest of drawers. Belongings, such as items of clothing, which they brought to their children or relatives disappeared. In its tour of Building 28, the morning of February 21, 1983, the court observed nothing in the identical chests of drawers assigned to many of the clients.

### 5. Inadequate Equipment

### a. Adaptive Equipment

Appropriately adapted and maintained equipment, particularly wheelchairs and orthopedic carts, is generally lacking at the Center. There has been a five-month delay in repairing broken wheelchairs. Some Suffolk residents spend their days, not in adapted wheelchairs, but in orthopedic carts—the use of which was condemned by defendants' own expert, Dr. Blanton, as preventing the clients from progressing appropriately and impeding their movement into the community.

Since the Center lacks sufficient vehicles to transport carts, the lack of adaptive wheelchairs prevents many residents from leaving their wards. At least 284 non-ambulatory clients (in addition to those in Building 19 and the upper floors of Building 16) remain confined to their residential buildings for the entire day, primarily because of transportation problems.

### b. *Motor Vehicles*

Some of the buses and ambulances owned and operated by the Center, and used to transport the clients are not safely equipped or properly maintained. Anthony Adams, a bus driver, told of being ordered to drive a bus which lacked working seatbelts to secure the residents' wheelchairs, and of an ambulance with emergency lights that did not function for six months.

With maintenance problems left unattended for so long, the vehicles frequently break down. The result is that some clients receive a short programming day because they arrive late.

An even greater risk of harm arises when breakdowns delay transportation to the emergency room of the hospital. At the public hearing of June 20, 1983 many parents of Suffolk residents expressed grave concern about the insufficient number and condition of the ambulances.

### c. *Adaptive Clothing*

Adaptive clothing is specifically constructed either for those whose physical handicaps require accommodation, or for those who require clothing modifications such as large buttonholes with oversize buttons, or a strip of velcro in place of a zipper, so that they may dress themselves. Kathleen Schwaninger saw no such clothing at Suffolk. If there is adaptive clothing at the Center, there is not enough of it to meet the needs of clients who could probably dress themselves, and more easily engage in other self-care tasks such as toileting were such clothing provided.

Apart from special clothing problems, many residents are not provided with clean, adequate, and appropriate clothing. Sometimes, they are not fully clothed. There are few examples of properly dressed residents in the many photographs submitted to the court. At the public hearing held June 20, 1983, one mother showed the court a pair of shoes her son had been given; there were many sharp nails sticking far out in the insides of one shoe and the instep was missing. Dennis Silverman, who wears size 42 trousers, has been given clothing so tight, that it was necessary to cut it from him with a scissors. Unlike normal children and adults, many of the clients cannot complain. They must mutely suffer this pain and indignity.

Parents and relatives testified that they have spent substantial sums of their own money to buy clothing for the Suffolk residents, only to have it disappear. What clothing there is has not been stored in dressers or chests or otherwise made accessible to the clients. There has been little opportunity for Center residents to learn to dress themselves appropriately or to learn to choose their own apparel.

### 6. *General Problems in Institutional Environments*

Hardly unique to the Center, but nevertheless affecting substantially the lives of some of the residents are environmental problems endemic to large, congregate-care institutions. Much of the testimony produced by both sides supported a professional consensus in favor of smaller facilities. Fred McCormack, the Director of the Suffolk Developmental Center, concurred.

The necessities of managing an institution which has more than a thousand clients and thousands of employees preclude many desirable changes. For example, plaintiffs' experts noted that when a few workers attempt to follow and control twenty-four residents, the staff get so involved in simply running after the clients, that ordinary common communication and interaction with them may not occur. Even with improved staffing and programming, and a warmer, more personal physical environment, residents of the Center are likely to pick up each other's negative behavior.

The chaos of this institutional environment makes any growth difficult, inhibits the learning process of the mentally retarded, and provides them with little opportunity to meet "normal" persons, or develop close relationships with them. Where friendships do take root, as between resident Laura Knapp and a staff worker, they are inhibited by institutional policies such

as that at the Center which prohibits clients from visiting the homes of staff.

Centralization of certain tasks such as cooking and laundering, necessary to the effective operation of a large facility, precludes the clients' opportunities to learn the rudiments of cooking and laundering. Supplies such as toilet paper, soap, linens and toothpaste are often hard to obtain because they are centrally located and kept locked up.

Brian Lensink summed up the matter by stating that living in a large institution

... takes away an awful lot of the natural training environment that would be available to people if they were in smaller settings. It is rather overwhelming to deal with your laundry in large commercial type laundry facilities or when there are thirty clients' clothing all sitting there ready to be washed. If you can go into the laundry room or the laundromat with only six residents from a group home you have an environment in which to train a person. That environment is not readily available on one of the wards. It is even more particular with food preparation. All the food preparation is done centrally, brought in in carts. You really have no opportunity to learn how to use any kind of kitchen equipment, how to even return your plates properly to the kitchen after you have eaten. You take away their whole training environment which is necessary for a person to live in a community. There are numerable training environments like that, mowing the lawn, maintaining the yard. Those are not only things that are important to teach a person so they can live in a community, it is also an activity to occupy time in a productive way rather than wandering or occupying a ward, if you could go out and mow the lawn, rake the leaves, shovel the sidewalk, trim the lawn, if you can do those kinds of activities in your home you then occupy your hours with meaningfulness rather than with nothingness. And so you both have a better life in my opinion as well as a

better training ground for those people who are learning to do those activities.

The restrictive rules of the Center, required by the huge number of people living there, make it impossible for the residents ever to acquire the skills necessary for success in a less restrictive environment. According to Kathleen Schwaninger:

... to maintain control over a population that size, over a campus that large, over 900 clients, 1300 clients, to try to meet your obligation to keep people safe, what ends up happening is that people can't be kept safe, first of all, but secondly, restrictions are imposed.

No state, including New York, builds large institutions for its mentally retarded citizens any longer. Other states are depopulating their large institutions. *See* Bogin, Group Homes for Persons with Handicaps: Recent Developments in the Law, 5 W. New Eng.L.Rev. 423, 424 (1983). All experts agree that small, community-based residences are better for the client and perhaps cheaper and more efficient for the state. This issue is discussed more fully below under Reduction of Population.

### 7. *Lack of an Internal Monitoring System*

Less than two months before the trial in this case, an internal monitoring system was finally implemented at the Center. Until that time, there had been no internal monitoring so that many of the problems already discussed—particularly regarding client care and environmental factors— were exacerbated. For example, the Incident Review Committee investigates specific instances of client abuse, injury and death, and makes recommendations about them. Until September 1, 1982, there was no specific procedure to follow-up the cases, to determine if recommendations had been carried out. The result, acknowledged by the Deputy Director for quality assurance at the Center as "an ongoing problem," was that the Incident Review Committee had to make the same recommendations over and over again.

## 8. *Funding*

Funds for the Center are obtained from a number of sources, all of which are channeled through the state. The process calls for the Director of the developmental center to submit a budget request to the state Office of Mental Retardation and Developmental Disabilities in Albany, which in turn uses the information to prepare its own budget request. That budget is submitted through the Governor to the legislature. The legislature then makes its appropriations on the basis of specific requests. There are limitations on the use of monies so that, for example, funds appropriated for physical renovations to bring the Center into compliance with federal standards may not be used to develop community resources for the mentally retarded on Long Island.

Compliance with federal safety and treatment standards is particularly important because the federal government through the Medicaid program pays fifty percent of the cost per client of those who reside in developmental centers which are certified as meeting federal standards. Federal reimbursement is made to the state, rather than to the individual institution, on the basis of a statewide average rate. In New York in 1982 the federal reimbursement rate per client was over $140 per day, or more than $40,000 a year. Since the per capita expenditure at the Center for fiscal 1981–82 was $32,100, it appears that the state expends virtually none of its own funds for client care there and that, in fact, some of the federal monies generated by Center residents are used for the benefit of individuals in other institutions. At Willowbrook, the Staten Island Developmental Center, for example, $48,400 was spent per client in fiscal 1981–82. In 1982–83, the per capita cost at the Suffolk Center was anticipated at $34,700 while at Willowbrook, the Staten Island Developmental Center, it was estimated at $60,800.

Other federal Medicaid funds are available under what is known as the Title 19 waiver provision for family care placements, which can include maintaining the mentally retarded person in his or her own home. *See* 42 U.S.C. § 1396n(c) (Supp. 1983). The Title 19 waiver also provides for a fifty percent federal reimbursement of funds, and may be used to fund case management, rehabilitation, respite, personal care, and homemaker services. New York State, however, does not participate in the waiver program. State appropriations for community placements and services for the mentally retarded have been cut back.

## 9. *Reduction of Population*

The defendants are aware of professional skepticism regarding the effectiveness of treatment at large institutions. Both plaintiffs' and defendants' experts supported community programming for virtually all retarded individuals. Direct testimony on this point was given by Edward Jennings, a professional with vast experience in the New York State system:

THE COURT: [G]iven adequate functioning of [personnel,] management, physical facilities and the like, can you set up an institution for 900 people in Suffolk on these premises that can do a decent job for people in the institution?

THE WITNESS: I don't believe that there is any historical record at all that that kind of resource, a facility of that kind, can be managed properly.

You know, again, I don't believe that we have a record of where a facility of that size, given all that it needs, can be operated successfully.

THE COURT: I take it, then, to sum up your view, you think that the probabilities of a more effective treatment are greater in the community-based facility than in a large institution of even 900 beds?

THE WITNESS: Without question.

Of primary importance is the fact that most mentally retarded people cannot generalize sufficiently well to learn in an institutional setting the skills they need to enjoy a more normal and less restrictive existence. According to Ms. Schwaninger:

... Part of the symptomatology of mental retardation is that the mentally retarded person, in his brain, doesn't have

the same kind of skills that we have, symbolically in our brains.

So it is not easy for a mentally retarded person to see a fake stop sign, walk out onto a real street, see a real stop sign, and realize that that's just like the fake one that the teacher was talking to me about.

Part of the symptomology is incapacity when it comes to symbolization and generalization and transference from an artificial learning experience to a real experience.

A small setting is also beneficial to retarded individuals because they have difficulty in integrating and discriminating among a large number of impressions or sensations. When there are large numbers of other clients and staff moving in and out of the picture, a retarded person may withdraw from the confusion and turn inward. The effects of size explain in part the higher staff morale and retention rates often seen in small community programs.

Community placement of mentally retarded individuals is further supported by the principle of normalization, a theory particularly attributed to N.E. Bank-Mikkelson in Denmark in 1959, Bengt Nirje in Denmark in 1969, and Wolf Wolfensberger in the United States in 1972. It is now accepted around the world and imparted to all appropriate state employees as part of their training. The essence of normalization is the integration of retarded people into society at large by ending their segregation and isolation in large-scale institutions.

According to the State training manual, normalization means, among other things,

> [l]iving in a normal neighborhood[,] not in a large facility with 20, 50, or 100 other people because you are retarded, and not isolated from the rest of the community. Normal locations and normal size homes will give residents better opportunities for successful integration with their communities.

Defendants generally share the plaintiffs' view that for the majority of Center residents, placement in some form of a small community based living situation would be more appropriate. Commissioner Slezak testified that New York is committed to "moving towards the community based system of care, and to reducing the populations at its institutional facilities." Judy Walker, the Director of Nursing at the Center said simply, "I don't think any client belongs at the Suffolk Developmental Center. If ... I could do anything to keep any client from having to be placed, I would be the first one to do it."

Perhaps the testimony of Fred McCormack, the Director of the Center, was most telling on this point:

> "We all want the same thing. We ... would want to place as many possible people as we can. And we're trying like heck to do it. And it takes the Legislature and the State of New York to find the resources to do it."

Mr. McCormack also noted that often those placed in the community function at a much higher level than at the Center.

This point is dramatically illustrated by the testimony of Philip Feibusch. His daughter, Susan, spent eleven years at the Center before moving to a group home in Greenport, Long Island. The contrast between the Center where staffing problems and anonymity create difficulties in training and the small community residence is striking.

> But the change that has come over Susan, it's like night and day. In six weeks there was a big change. She does things there that I never thought were ... possible. I didn't think that Susan could make her bed.... She was learning how to dress herself.... And she places her clothes and everything away. She takes her own showers. She washes her own hair.... She is living like a human being. She even makes her own sandwich and helps with the cooking....
>
> Q What about toilet accidents, does she have those any longer?
>
> A Not in the house any more, no. She knows where to go....
>
> Q Did Susan ever have an opportunity to practice those skills that she may have

learned in the day program at AHRC while she was living in the Suffolk County Developmental Center?

A .... No....

The population at the Center has not been reduced to the extent all agree it should be. Community residential placements, day programs, and necessary clinical and support services have not been provided in numbers sufficient to meet the needs of those currently at the Center. Nor has adequate aid been given to those mentally retarded persons in Nassau and Suffolk Counties and their families who are not in state custody, but are often without adequate resources.

Under the original five-year plan devised by New York State to comply with federal Medicaid requirements, the Center's population was to have been reduced to 907 by March, 1982. Yet, on October 21, 1982, the day the trial in this case ended, the Center cared for more than 1,200 clients—300 more than it should have had.

Not only have the defendants failed to comply with their own five-year plan, they have developed no new plan to replace it. Though Deputy Commissioner Robert Norris mentioned a plan to bring the Center's population to 900 by March 31, 1984, he acknowledged that no written document exists reflecting this goal. There is no plan to reduce the population below 900.

The testimony of Dr. George E. Smith, Director of the Office of Community Services for the Long Island Developmental Disabilities Services Office, revealed that there was no program to place Center residents in the community, other than studies of projected need. Though he too testified that there was no specific written plan for reducing the Center's population, on the last day of trial, Director Fred McCormack produced a table showing projections reducing the population to 1070 by April, 1984; and to 810 by April, 1987. Those figures were supported by no documents, explaining where and how those placements out of the Center would be accomplished.

At the hearings in June on the Director's plan to comply with the court's interim order, a schedule of projected new community centers was revealed for the first time. It reads as follows:

**PROJECTED SUFFOLK DEVELOPMENTAL CENTER PLACEMENTS**

Fiscal Year 83/84 (Based on actual census 1,194, 4/1/83)

| Location | No. of SDC Clients | No. of Community Clients |
|---|---|---|
| Lattingtown | 10 | 0 |
| East Northport | 12 | 0 |
| Garden City Park | 8 | 0 |
| Upper Brookville | 4 | 4 |
| Eastport | 7 | 0 |
| Farmingdale | 10 | 0 |
| Westhampton | 8 | 0 |
| Plainview | 9 | 0 |
| Wading River A | 8 | 2 |
| Wading River B | 8 | 2 |
| Riverhead | 4 | 4 |
| Setauket | 1 | 0 |
| Melville | 1 | 0 |
| Family Care | 27 | 0 |
| Total | 117 | 12 |

Fiscal Year 84/85 (Based on projected census 1,077, 4/1/84)

| Location | No. of SDC Clients | No. of Community Clients |
|---|---|---|
| Bayville | 0 | 48 |
| Wantagh | 4 | 4 |
| Woodbury | 5 | 5 |
| Coram | 8 | 4 |
| Smithtown | 5 | 4 |
| Commack A | 4 | 4 |
| Commack B | 14 | 14 |
| Rockville Center | 5 | 5 |
| Dix Hills | 4 | 4 |
| Oakdale | 4 | 4 |
| Family Care | 24 | 0 |
| Total | 77 | 96 |

Projected Census 1,000, 4/1/85

The following is a listing of potential sites presently under review that may yield additional placements during FY 84/85:

| | | | |
|---|---|---|---|
| Holbrook | 8 | North Bellmore | 8 |
| Yaphank | 8 | Syosset | 8 to 10 |
| Medford | 10 | Wantagh | 8 to 10 |
| Middle Island (5 acres) | 48 | | |

These projections are probably the most that can realistically be expected. Dr. Smith, who is responsible for the development of community resources for the retarded in Long Island, testified that he could not plan to develop community sites beyond 1983 because of lack of money:

[W]e have experienced cut-backs in that funding. The result is that at present we have no acquisition money for the purchase of new property, and that the first instance money, that is the money that would go to start up or renovations of—of houses that we could purchase has been drastically reduced. Therefore, ... we don't really know what the picture looks like. And it's very, very difficult for us to make any kind of firm plans beyond next year.

Planning is requisite both to guide the placement effort, and to secure adequate funding from the legislature and cooperation from local private and public agencies and private citizens. What is called for is a comprehensive long-term plan which includes an assessment (in the aggregate) of individual client needs, a description of the programs and services required to meet those needs, an inventory of available programs and services and a catalogue of those that must be developed, a description of the administrative measures and procedures that must be followed in order to develop the needed programs and services and a specification of responsibilities for carrying out such measures and procedures, an analysis of potential obstacles and their possible solutions, a statement of the means by which required programs and services will be funded, and a timetable indicating when all necessary events are scheduled to occur. No single one of the defendants' plans, or even all of them, taken together, contained all of the necessary elements.

### B. Lack of Adequate Services and Programs in the Community

The state is doing relatively little to encourage the development of small-scale settings and to provide the necessary home and community support facilities.

### 1. The Retarded at Home

The overwhelming majority of the approximately 18,000 mentally retarded and developmentally disabled in Nassau and Suffolk Counties live at home. The Long Island agency of the state Developmental Disabilities Services Office whose responsibilities include coordination of all services to this constituency is housed at the Suffolk Developmental Center. Retarded citizens living at home are not members of the certified class. Nevertheless, some appreciation of their problems is necessary for an assessment of realistic remedies for the certified class in this case.

At the trial, parents who have chosen to keep their severely handicapped children at home testified to the lack of available local community residences and day programs and the extraordinary strains placed on the other members of the family by keeping the child at home. One father asserted, however, that he would rather see his son dead than at the Center. Others, parents and relatives of current Center residents testified that they felt compelled to institutionalize their children or siblings because no community services or programs were available that would permit them to remain at home.

As noted above, the professional consensus endorsed by the defendants is that residence in the community is the most effective, appropriate form of treatment for most mentally retarded individuals, including those with severe psychological and physiological disorders. It would be expected then that the defendants would support all efforts to maintain those already living in the community, in their homes—the most "normal" situation of all—by making available the necessary doctors, psychiatrists, psychologists, case workers, social workers, physical therapists, occupational therapists, speech therapists, and respite and homemaker services for the families. As Brian Lensink pointed out, many families do not need to place their retarded children outside the home if they are provided appropriate support.

Nevertheless, the state provides almost no funds to maintain clients in their own homes. It has not, as pointed out above, applied for federal funds to do so under the Title 19 waiver provision, 42 U.S.C. § 1396n(c), which provides funding for a wide variety of habilitation services for

mentally retarded individuals in any type of community setting, including their own homes, with 50% federal reimbursement.

### 2. *Existing Community Residential Alternatives*

Community residences are operated by the state and by private not-for-profit voluntary agencies, with whom the state contracts. In Long Island, the state provides four types of community residential alternatives—supportive living arrangements, family care placements, community residences, and intermediate care facilities.

Supportive living arrangements are for generally high functioning individuals who can live independently in an apartment with little supervision. Currently, there are 59 clients in Nassau and Suffolk counties in supportive living arrangements.

In a family care situation, a family, called a provider, takes a mentally retarded or developmentally disabled individual into its home to live as a family member. The providers are given a 16-hour training session, after which they are licensed by the state. There are 212 clients in Long Island in family care. In 1982, only 15 family care placements were made in Long Island.

In explaining the low number of Long Island family care placements, Dr. Smith mentioned that his office had encountered recruitment problems in locating family care providers. There may be other explanations as well. For example, New York has no system of variable rates for family care providers, so that those providing for more handicapped individuals receive the same rate, about $300 per client per month, as those providing for the less handicapped, though the former may well require more time and attention. The rate for family care in Arizona, by contrast, ranges from $200 to $900 per month. Defendants' expert, Dr. Blanton, uses a variable rate structure in Illinois and would recommend it for New York as well.

Defendants acknowledge that it is harder to place the more handicapped clients in the community. New York's use of a flat rate may therefore account in part for the low number of family care placements in Long Island.

Personal care providers give services to more handicapped clients, who have both medical and behavioral problems. They function much like family care providers, but receive additional training and a supplementary reimbursement. There are no personal care placements on Long Island.

A community residence is generally a single family dwelling with 4 to 14 clients. Although clients are supervised, either by live-in house parents, or by rotating shifts of staff, clients usually prepare their own meals, keep their own belongings and go out together to shop for food and clothing.

There are 177 clients from Nassau and 135 from Suffolk in community residences. By contrast, in Westchester County, which is roughly comparable to Nassau in size, population and socioeconomic factors, there are 606 retarded individuals living in community residences. N.Y. Times, June 26, 1983, § 11 (Westchester Weekly), at 4, col. 3.

All community residences on Long Island are run by private, voluntary agencies. None are presently operated by the state. The residences house only ambulatory clients, even though nonambulatory clients who can maneuver their own wheelchairs could be accommodated in a community residence setting.

A fourth type of community setting found on Long Island is the intermediate care facility. This is similar to a community residence, but provides greater supervision for those clients with more substantial medical and behavioral needs. There are 333 clients in intermediate care facilities on Long Island. Seven such facilities are operated by the state. Others are operated by private agencies. The state also runs several free-standing intermediate care facilities that adjoin the Suffolk Developmental Center.

All residents of the state-run intermediate care facilities have come from the Center. Clients housed in the state facilities are those with the more serious problems

because the private agencies are hesitant to assume the care of clients with severe behavioral problems.

As the experience with community residences and intermediate care facilities indicates, the voluntary agencies that now operate residence programs on Long Island do not, with the possible exception of the United Cerebral Palsy Association, serve clients who are severely or profoundly retarded and wheelchairbound, or difficult to manage behaviorally. There was testimony that non-Nassau-Suffolk voluntary agencies wishing to open residences and operate programs that would service the more handicapped clients were not welcomed.

To sum up, a total of 916 Nassau-Suffolk County clients have been placed in some community residential alternative as follows:

| Placements | Alternative |
| --- | --- |
| 59 | supportive living |
| 212 | family care |
| 0 | personal care |
| 312 | community residences |
| 333 | intermediate care facilities |
| 916 | |

While these figures seem impressive many of them reflect placements of Willowbrook class members mandated by the terms of the Consent Judgment. Also included are placements of other clients who were never at the Center.

Both state and privately operated community residences are funded by a combination of federal social security and state payments; each theoretically accounts for about 50% of the cost. Intermediate care facilities are funded on a rate system, under which federal Medicaid monies pay for 50% of the cost, and state and local funds each contribute 25%. For those clients who have lived in a state institution for five or more years, the state pays a larger share of the cost.

According to all the testimony on the point, the overall cost of care for a client living in the community was never more than, and is generally significantly less than, that in an institution such as the Center. Defendants' expert, Dr. Blanton,

testified that ninety percent of the current Center population could be readily moved into the community within five years, and that the cost of maintaining them there would be less than if they stayed at the Center. A letter from Commissioner Slezak to the Deputy Majority Leader of the New York State Senate, states that "the overall costs for all community residential options is about 50% the cost of a developmental center." The letter, dated October 14, 1981, gave the following overall per client cost figures:

| | |
| --- | --- |
| Voluntary operated community residences | $22,700 |
| State operated community residences | $33,000 |
| Voluntary operated intermediate care facilities | $46,400 |
| Developmental Centers | $53,200 |
| Family Care Homes | $14,200 |
| Family Care, personal care | $16,200 |

(Emphasis supplied.) These disparities in cost, while striking, probably do not fully reveal overall costs including capital, support facilities and administrative supervision. Moreover, it must be remembered that the most difficult cases, on the average, remain at the Center. The figures do suggest, however, that compelling a reduction in Center population will not place an impossible financial burden on the state.

3. *The Process of Developing Community Sites and Services*

The bureaucratic maze, community pressures and practical problems all present barriers to providing community residences for the mentally retarded. The Office of Mental Retardation and Developmental Disabilities works directly with nineteen voluntary agencies in Long Island. Before a voluntary agency opens a community residence or program, it first sends a letter of intent to the Associate Commissioner. The agency must then comply with the state determination of need, called a Part 51 process for establishing day treatment programs, and a Part 53 process for the development of community residences. See 14 N.Y.C.R.R. §§ 51, 53. This calls for proof of need for the program, of the competence of the agency to operate it, of financial

responsibility, and of conformity to state and federal standards. A 60-day review period follows the agency's filing of a Part 51 or Part 53 application, during which representatives of the county certify it; if it does not receive county certification, the application is returned to the agency for modification. Once certified by the county, the application is reviewed by the regional office of the federal Health Planning Commission, and again by the County Mental Health department, both of which must also approve the application.

If the application is disapproved by the County, the Commissioner has the power to override the disapproval, though there has never been an override in Nassau or Suffolk. Both Nassau and Suffolk have denied approval on numerous occasions.

Need may also be established through the state's initiative. It publishes a request for a proposal, making known the need for programs or services to serve a certain category of the handicapped.

If the plan for a community residence or intermediate care facility is approved, the state Facility Development Corporation works with a local site development unit to locate an appropriate house. When a potential site is found, the town receives notice of the intent to establish a residence. See N.Y. Mental Hygiene Law, § 41.34. At that point, the town has three options: it may either approve the site, offer an alternative site, or reject the site but only on the basis of saturation. See N.Y. Mental Hygiene Law § 41.34.

With purchase negotiations, physical construction and renovations, and medical-safety certification, it takes about 19 months from the time of the initial site selection for a home to open. Purchase negotiations may be complicated and drawn out. Unlike some other states, New York does not guarantee mortgages for the voluntary agencies so that they can more easily secure mortgages and purchase the home themselves.

Defendants relied heavily on community opposition to community residences in explaining their lack of success in developing community placements in Long Island. To counter such opposition, the state maintains offices of Public Education and of Public Relations which staff various speakers bureaus throughout the state's twenty regional Developmental Disabilities Services Offices. In Long Island there are two full-time people assigned to public education. They rely on various forms of the media as well as on speeches and face-to-face discussions with opponents.

Though community opposition has apparently led to three instances of arson in Long Island, no client has ever been harmed. A state study indicated that community resistance derives from, first, fear that a neighborhood's property values would be diminished if a community residence were established, and, second, from fear of the mentally retarded—as violent, dangerous, unfriendly persons. Both of these fears appear to be unfounded.

One state study demonstrated that the presence of a community residence in a neighborhood had no effect on property values. "Group Homes for the Mentally Retarded: An Investigation of Neighborhood Property Impacts." Fear of mentally retarded persons may in part be attributed to the public's confusion of the mentally ill with the mentally retarded. As Gary Shaw, who once led the opposition to a community residence that was established in his neighborhood in Valley Stream, Long Island, explained:

> We were afraid of any sort of mental handicap. We didn't know that there was any difference. We were thinking of child molesting; I have eight nieces and nephews and I swore that the first one who ever came through the bushes in my parents' yard, I would shoot.

> [The community residence] is directly across the street from a school, and we were afraid, being adult bodies with children's minds, they would have problems of playing with kids.

Both plaintiffs and defendants agreed that such fear is best refuted by the community's experience with their retarded neighbors. Gary Shaw now regards his re-

tarded neighbors as his friends; he visits them in their home, and they visit him in his. The property value in his neighborhood has increased. Moreover, Shaw works with other communities in Nassau and Suffolk who are resisting group homes. "I would tell the people, I know where you are coming from, I know what you are afraid of, I went through it, and you don't have to worry."

Julia Benjamin, who lives next door to a group home in Greenport, Long Island, considers the home a benefit to her community. She testified because she thought

this case would affect people that are at Suffolk Developmental Center now, possibly, and I see the way that the people next door are, and I feel that they have a nice life, and they have improved, and [are] doing well, and I think everybody should be able to.

## IV. LAW AND ITS APPLICATION

Plaintiffs based their claims on several legal theories, invoking the federal and New York State constitutions, the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6011 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and various provisions of the New York Mental Hygiene Law. They argue that deficiencies in the physical environment, number and training of staff, substance and implementation of therapies and of developmental plans, and in the amount and nature of the programming make the Center incapable of providing adequate care, treatment and habilitation to its residents, of protecting them from harm, and of preventing their regression. For these reasons, they maintain that community placement of all the residents of the Center is the most appropriate form of relief.

### A. Due Process Right to Minimally Adequate Care and Treatment

In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that the "liberty interests" protected by the Due Process Clause of the Fourteenth Amendment provide mentally retarded persons in state institutions substantive rights to conditions of reasonable care and safety, freedom from undue restraint, and to that level of "minimally adequate or reasonable training [necessary] to ensure safety and freedom from undue restraint." 102 S.Ct. at 2458–2463.

Constitutionally "reasonable care" requires that the state provide adequate food, shelter, clothing, and medical care. 102 S.Ct. at 2462. The right to freedom from undue restraint means that the state "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Id.*

The level of training required places the state under a duty to provide a retarded client "such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Id.* Although the Court found that no question of a general constitutional right to "habilitation" was presented, 102 S.Ct. at 2459, and thus declined to address the issue, it noted that "[i]t may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence." *Id.* at 2462–2463. Specifically it indicated that respondent Romeo had been denied training, including self-care programs, that professional experts agreed were needed to reduce his aggressive behavior. *Id.* at 2459.

Justice Blackmun's concurrence, joined by two other members of the Court, elaborated on the minimal level of training called for. It pointed out that the Constitution requires that an institutional resident be provided with "such training as is reasonably necessary to prevent a person's pre-existing self-care skills from deteriorating because of his commitment." Thus,

The Court makes clear ... that even after a person is committed to a state institution, he is entitled to such training as is necessary to prevent unreasonable losses of additional liberty as a result of his confinement—for example, unreasonable bodily restraints or unsafe institu-

tional conditions. If a person could demonstrate that he entered a state institution with minimal self-care skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him with training, then, it seems to me, he has alleged a loss of liberty quite distinct from—and as serious as—the loss of safety and freedom from unreasonable restraints. For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know. 102 S.Ct. at 2464.

■ Inherent then in the Supreme Court's vision of that level of training to which mentally retarded residents of state institutions are constitutionally entitled is a recognition that such basic self-care skills as the ability to dress oneself and attend to one's own hygiene needs are requisite to any exercise of those "liberty interests" protected by the Due Process Clause. 102 S.Ct. at 2464. All of the qualified professionals, both plaintiffs and defendants, who testified in this case agreed that the denial to a resident with the capacity to do so of the opportunity to learn to speak and to toilet, to dress and feed himself would constitute a professionally unacceptable restraint.

In accordance with the Court's instruction in *Romeo* that deference be paid to the judgment of qualified professionals, 102 S.Ct. at 2461–62, the testimony and other proof dictate that training in basic self-care skills be provided as a constitutional right. *See Association for Retarded Children of North Dakota v. Olson,* 561 F.Supp. 473, 487 (D.N.D.1982):

... training in walking or basic communication would be required if the resident could benefit therefrom, since these skills enable the exercise of basic liberties.

Further, the right to minimally adequate training can be reasonably construed to grant a right to reasonable training which enables the resident to acquire or maintain *minimum* self-care

skills—skills in feeding, bathing, dressing, self-control, and toilet training.... Given the great difference that minimum self-care skills make in the life of most mentally retarded persons, this court regards the acquisition and maintenance of those skills as essential to the exercise of basic liberties.

(Emphasis in original.) *Cf. O'Connor v. Donaldson,* 422 U.S. 563, 569, 95 S.Ct. 2486, 2490, 45 L.Ed.2d 396 (1975) (finding unconstitutional confinement of nondangerous individual capable of surviving safely on own where "confinement was a simple regime of enforced custodial care, not a program designed to alleviate or cure his supposed illness"); *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.").

■ Courts "must show deference to the judgment exercised by a qualified professional." *Romeo,* 102 S.Ct. 2452, 2461. Such judgments by those qualified through training "or experience," 102 S.Ct. at 2462, are to be treated as presumptively valid; "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on the judgment." *Id.* at 2462.

Although *Romeo* was decided in the context of an involuntarily committed mentally retarded person, the constitutional protections it describes embrace residents of state institutions for the retarded, including those whose commitment may have been technically voluntary. *See Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. at 485 ("An individual's liberty is not less worthy of protection merely because he has consented to be placed in a situation of confinement."); *Garrity v. Gallen,* 522 F.Supp. 171, 239 (D.N.H.1981); *Philipp v. Carey,* 517 F.Supp. 513, 518–519 (N.D.N.Y.1981); *Kentucky Association for*

*Retarded Citizens v. Conn,* 510 F.Supp. 1233, 1248 (W.D.Ky.1980); *New York State Association for Retarded Children v. Carey,* 393 F.Supp. 715, 718 (E.D.N.Y.1975).

Particularly where, as in this case, those unable to care for their retarded relatives at home have no real option but to place their children and siblings at the Center, the distinction between the voluntarily and involuntarily committed is meaningless. The defendants do not disagree. As the Director of the Center stated at the close of the trial, "the role of the state residential facility is to be the court of last resort for those people who can't be served any place else." So far as the client is concerned, he or she has no say in the matter. The mentally retarded client's stay in the institution must be deemed involuntary.

■ *Romeo* interprets the Fourteenth Amendment as guaranteeing four specific sets of rights to the residents of the Center. These may be characterized as follows:

1. A right to adequate food, shelter, clothing and medical care;

2. A right to reasonably safe conditions;

3. A right to freedom from restraint, except insofar as professional judgments determine such restraints necessary to assure a resident's safety or to provide needed training; and

4. A right to such training as professional judgment determines is reasonable to ensure a resident's safety and to facilitate his or her ability to function free from bodily restraints.

From 1978 when this case began through the present, these rights have been and continue to be denied the residents at Suffolk Developmental Center.

1. *Right to Adequate Food, Shelter, Clothing and Medical Care*

   a. *Adequate Food*

In some cases, the Center has not provided constitutionally adequate food to its residents. The problem, generally, is not the quality of the food itself, but understaffing and program deficiencies which effectively permit certain residents with aggressive behaviors to grab food from others, who thus do not receive enough. Russell Cohen, for example, developed regurgitating behavior while a resident of Building 26, Ward B, because, according to the diagnosis of an outside hospital, he was not receiving enough food. Since food was being served, the staff in that ward concluded that the grabbers took Russell's food. After Lisa Gorelick was admitted to the Center, her parents found her "about half the weight she was and completely limp." They immediately brought her to an outside hospital, which diagnosed her condition as dehydration, and kept her for treatment for two weeks.

   b. *Adequate Shelter*

In the most recent report of May 1982, the survey team found 58 pages of environmental, maintenance, sanitation, safety, and programmatic violations, and timely completion of only 18% of scheduled preventive maintenance. The Center is faced with constant problems with its air conditioning and heating systems; with recurrent invasions of rodents and cockroaches; with transportation and equipment breakdowns; with shortages of supplies such as bed linens and toothpaste; and with periodic outbreaks of shigella, hepatitis and other infectious diseases.

One of the defendants' experts admitted that with regard to the physical plant, "there are substantial deficiencies which don't quite reach the minimal standards that are now in effect by the Federal Government." For substantial periods and for substantial numbers of residents, defendants are not providing constitutionally required adequate shelter.

   c. *Adequate Clothing*

Residents are not consistently provided with clean, adequate and appropriate clothing. Occasionally, they are not clothed at all.

■ With some exceptions such as the residents of Building 19 (the pulmonary unit), clients seen by plaintiffs' experts were not dressed appropriately, but rather

wore dirty, torn and ill-fitting garments. Nor is enough adaptive clothing currently provided at the Center to meet the constitutional minimum. Not only does the failure to provide such clothing contravene the state's constitutional duty, but it also denies to those clients needing such clothing that level of training constitutionally required for the maintenance or acquisition of such fundamental self-care skills as dressing and toileting.

In some cases, the failure to supply special clothing, or to provide access to that special clothing provided by the resident's parent or relative, may endanger the resident's health. Nicolina Coster, for example, a 50 year old resident of Building 2, suffers from lymphatic anemia, a blockage of the lymph glands, in her right leg. As a result, if she does not wear orthopedic shoes and special bandages, her leg becomes infected. Although Ms. Coster came to the Center with two pairs of the shoes and several bandages, she does not wear them.

### d. Adequate Medical Care

■ There are not enough doctors, dentists and nurses to provide adequate medical care to all of the residents. One or two doctors on call at night and on the weekends for a population of 1,200, many of whom have substantial medical problems, are not enough to meet constitutional minima. Lack of sufficient dental care caused Susan Feibusch's gums to deteriorate, necessitating the surgical removal of nine of her teeth. It is plain that resident Dennis Silverman's right to adequate care was violated when the post-operative therapy ordered by his doctor to prevent the paralysis of his legs was not performed. The continued failure to repair ambulances prevents the provision of adequate medical care outside the institution.

The inability of the clinical staff to provide adequate medical care is compounded by the general shortage of direct care staff. Staff on the wards may be so overburdened, or tired due to long shifts, that they may not know a resident has been injured, and thus be unable to provide necessary medical care. Use of floating staff, who are not familiar with the clients, necessitated by the staffing shortage, as well as by administrative staffing policies, has led to certain residents, mistaken for others, being given the wrong medications.

### 2. Right to Reasonably Safe Conditions

■ The state's denial of adequate food, shelter, clothing and medical care has the effect of violating the residents' constitutional right to safe conditions. These factors in combination with the problems of understaffing, floating staff, lack of programs and adequate treatment plans, and lack of staff familiarity with such plans, create an environment that cannot protect, within constitutional minima, residents from harm.

Without direct care staff that is adequately trained in programming, or aware of treatment plans, that level of training which is necessary to preserve the physical safety of the residents, cannot be provided. The absence of programs and adequate treatment plans for those with negative behavior that cause injury both to themselves, and to other residents, and lack of staff familiarity with, or access to, such plans or programs where they do exist, together with the fact that clients often receive little attention due to general understaffing and concomitant staff fatigue, the use of a critical minimum policy and of floating staff, and lack of adequate staff training and supervision, have led to many incidents, accidents, and epidemics at the Center, often resulting in serious injury and, occasionally, death. Michael Maggio died from swallowing plastic gloves; Eileen S., 26, died of scalding burns; Wayne W., nine years old, died of bilateral pneumonia; Robert M., 34, was dead from an apparent seizure after an abnormal brain wave pattern was ignored; James P., 30 years old, who was placed in a locked "time-out" room alone in violation of Center policy, fell out of a first-floor window, breaking his arm; Teresa, 27 years old, banged her head on unprotected cribs or carts without any intervention by nearby staff; Lisa Gorelick, 22, was blinded in one eye because of un-

controlled head-banging; Robert Stutz, a 36 year-old man, required 17 stitches over one eye and 14 over the other because of injuries inflicted by himself or other inmates; Nicolina Coster, 50, was repeatedly beaten by another resident while the staff person on duty continued to watch television; and Dennis Silverman, 37, was found sitting on a bed of vermin.

Other types of safety hazards include defective fire alarms. At the June hearing the Director admitted that the hot water safety valves were not operating properly, increasing the possibility of scalding in showers.

The persistent practice of feeding nonambulatory residents in a supine position is an improper and dangerous technique that can cause aspiration of food into the lungs, resulting in pneumonia, scarring, decreased lung volume, reduced life span and even death. In one month, November 1981, three of the four deaths occurring at the Center were linked to aspiration or pneumonia, while the fourth was traced to intestinal obstruction and fecal impaction, related to ingestion of inedible objects or neglect of client needs.

Prevalent at the Center are epidemics of such serious diseases as shigella, hepatitis, diarrhea, pneumonia, chicken pox, measles, and mumps. Shigella, which results in diarrhea, bloody stool, and fever, is transmitted by fecal contamination; hepatitis, a liver infection, can be airborne or, in the case of hepatitis B, spread through fecal matter or some type of intimate contact such as biting. Both can be prevented by basic sanitary and housekeeping measures and by proper supervision of clients. Such diseases are less likely to be found in small community residences serving the same type of clients.

The Center's system for reviewing and preventing incidents and injuries by the Incident Review Committee has admittedly been ineffective. Until September 1, 1982, there was no formal system consistently monitoring the follow-up recommendations made by the Incident Review Committee. Thus, in defendants' own example of the operation of the Incident Review Committee regarding a client (Joseph S.) who fell and cut his chin because of a seizure, Deputy Director Stanley Slawinski, the administrator responsible for institutional monitoring, could not say, 16 months after the incident occurred, whether Joseph ever was given the chin guard or the barrel chair recommended by the Committee.

All of the experts but one agreed that in some respects the Center is not providing its residents safe conditions. Even the one witness offered by defendants who testified that the Center did provide a safe environment for its clients, was dubious about many aspects of the Center's activities. The consensus of the qualified professionals, then, is that the Center does not provide its clients conditions of reasonable safety, contrary to what is constitutionally required under *Romeo*.

The long list of institutional deficiencies is not due to any professional judgment. The Director and staff are not callous or indifferent. They know that they are not supplying the services their training and roles require. Substantial departures from acceptable standards "demonstrate" that they do not base their decisions to deprive their clients on their professional "judgment," 102 S.Ct. at 2462, but rather on the failure of the state to provide funds and freedom of action.

Lack of personnel capable of exercising professional judgment in many individual cases itself represents a failure to provide constitutionally safe conditions. In *Romeo,* the Supreme Court specified that "[l]ong-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate [clinical] training ...";"... day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons." 102 S.Ct. at 2462 n. 30. At the Center, both long-term and day-to-day decisions are often made by persons who do not meet the Supreme Court's standard. This

failure increases the probability that the decisions made for and about the residents may not guarantee their constitutional level of safety.

The lack of enough clinical staff means that long-term treatment decisions may be made by those without sufficient training or that such decisions may never be made. The effect is to deny residents a plan or program for long-term treatment, as well as the right to adequate medical care and the right to that minimally adequate or reasonable training guaranteed by the Constitution.

Without adequately updated psychological evaluations, long-term psychological treatment decisions cannot be appropriately made. A recent survey found that half the records reviewed in Building 28 lacked updated psychological evaluations. Inadequate training and supervision of direct care staff mean that many "day-to-day decisions" may not be made by those who are professionally competent to make them. Shortage of staff and the critical number policy often result in low staff morale and fatigue, which are increased by too few breaks and shifts that can range up to 16 hours. These may affect client safety and may contribute to client abuse. For example, there was testimony about a beating by a member of the staff observed by another member; no action was taken to prosecute. In another instance, bootmarks were found on one boy's body matching boots of the shower attendant.

3. *Right to Freedom from Undue Restraint*

Unnecessary restraints are placed on the residents. The most obvious example is the locking of otherwise ambulatory persons into wheelchairs with confining lapboards and failure to put on braces required for walking.

Absence of safely equipped vehicles to transport those who cannot walk, and are confined in wheelchairs or carts, unnecessarily curtails their opportunities to participate in programming and other activities both on and off the grounds of the Center.

Lack of enough appropriately equipped vehicles operates as an undue restraint on both the ambulatory and non-ambulatory, since it deprives them of the freedom to make personal choices of what to wear and what to eat by preventing them from visiting shops, restaurants, and recreational facilities. *See Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. at 486 ("This right [to freedom from undue restraint] obligates the state to provide capable retarded citizens with reasonable opportunities to make trips into the outside communities."). *See also* Note, Beyond *Youngberg:* Protecting the Fundamental Rights of the Mentally Retarded, 51 Fordham L.Rev. 1064, 1072–1074 (1983). Clients are restrained by drugs, which have been used, according to the Director of Nursing, instead of treatment plans. The fact that there are so many locked doors to buildings, to dayrooms within the buildings, to bathrooms, and to sleeping areas functions as another restraint.

Plaintiffs' experts were in agreement that the living environment at the Center had a harmful, negative effect on the residents and created a situation in which learning was not possible. The very restrictiveness of the Center setting, necessitated by the number of people living there, makes it impossible for the residents to acquire the skills necessary for success in a less restrictive environment.

The physical restraints that necessarily result from understaffing and those inherent in institutional life, are heightened by the absence of consistent reinforcing programming. If each client were receiving individual programming appropriate to his or her needs, then not all of a group of clients would need to be restrained on account of a few individuals.

■ Some residents, such as Laura Knapp, are unduly physically restrained by living in the Center. They are capable of much freer and more productive activities in small group community based homes. For these individuals, the Constitution mandates placement in a group home, or in

some other situation in the community, where they can effectively exercise their proven ability to live independently. As resident Laura Knapp herself so poignantly put it:

> I have been living in institutions, various institutions, for most of my life and I would like to go and see what it's like to live at somebody's house and be, like you know, once in a while, to get that kind of love that other kids get.

In *Romeo,* as noted above, the Supreme Court did not decide whether the Due Process Clause embraces a general right to habilitation. *See* 102 S.Ct. at 2459. Lower courts, however, have supported the theory of a right to a least restrictive alternative requiring some habilitation. *See generally Philipp v. Carey,* 517 F.Supp. 513, 518 (N.D. N.Y.1981) (mentally retarded residents of state-run Syracuse Developmental Center have Due Process claim "to treatment in settings that pass muster under an appropriate least restrictive alternative inquiry"); *Welsch v. Likins,* 373 F.Supp. 487, 501–502 (D.Minn.1974), *vacated in part and remanded in part,* 550 F.2d 1122 (8th Cir.1977) (Due Process Clause requires state to "make good faith attempts to place [mentally retarded] persons in settings that will be suitable and appropriate to their mental and physical conditions while least restrictive of their liberties"); *cf. Wyatt v. Stickney,* 344 F.Supp. 387, 390 (M.D.Ala.1972), *aff'd sub nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir.1974).

In the case before us we need not find any abstract constitutional right to a least restrictive environment. That entitlement is accepted as professionally required by the testimony and is implied in the explicit right to care and treatment provided by state law. *See Project Release v. Prevost,* 551 F.Supp. 1298, 1305 (E.D.N.Y.1982); *Woe v. Mathews,* 408 F.Supp. 419, 428 (E.D. N.Y.1976); *aff'd sub nom. Woe v. Weinberger,* 562 F.2d 40 (2d Cir.1977); New York Mental Hygiene Law §§ 15.01, 15.03, 33.-03(a). Community placements for those current institutional residents who can adjust outside the institution is required by New York law. *See* New York Mental Hygiene Law § 33.03(a).

Deference to the judgment of a qualified professional, *Youngberg v. Romeo,* 102 S.Ct. 2452, 2641, also dictates this result. All experts, both defendants' and plaintiffs', agreed that many clients of the Center could be safer, happier and more productive outside the institution in small community residences. Their professional judgment was that transfers should be made as soon as the facilities could be made available and, that the state was capable of providing them in large numbers relatively quickly. The Constitution mandates community placement for those who have been adjudged by qualified professionals to require a community setting in order to exercise basic liberty interests, which would otherwise be denied them by what are for them the undue restraints inherent in institutional life. *See Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 486.

All of the residents of the Center have been referred for placement in the community. There was much testimony that physical and behavioral handicaps are not barriers to such placements. Defendants' expert Richard Blanton testified that, with the appropriate arrangements, 90% of the current Center population could be served in the community. By failing to provide enough community placements, and accompanying educational or workshop day programs, the defendants have unduly restrained many residents for whom institutional life precludes the exercise of basic liberties.

### 4. *Right to Minimally Adequate Training*

Under *Romeo,* the Constitution requires that a state institution provide that level of training which is determined by a qualified professional to "be reasonable in light of [the resident's] liberty interests in safety and freedom from unreasonable restraints." 102 S.Ct. at 2452. As noted earlier, the Court's analysis of constitutionally reasonable training, as highlighted in Justice Blackmun's concurrence, included a requirement

that minimum self-care skills be maintained. *See* 102 S.Ct. at 2462–2465; *Association for Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 487 (D.N.D. 1982). In the case of an individual who entered an institution with self-care skills lost due to the state's failure to provide training, this right, *Romeo* indicates, would be violated. *See* 102 S.Ct. at 2464. Similarly, the Constitution requires the institution to provide the resident with training to acquire such self-care skills, since this "is as much liberty as they will ever know." *Id.*

■ The record contained numerous examples of precisely the sort of regression condemned in Justice Blackmun's concurring opinion. Loss of skills was caused by programming and other deficiencies. The Center has not provided its residents with the minimal training required by the Constitution. This conclusion is supported by the testimony of the qualified professionals presented by both plaintiffs and defendants, of parents and relatives of residents, as well as by numerous citations in the survey reports.

Nor has the Center provided the training to enable those capable of learning basic self-care techniques to acquire them. Toilet training of many is inadequate or nonexistent. Absence of feeding and physical and speech therapy programs prevents many residents from feeding and expressing themselves and moving independently— basic skills essential to the exercise of the most fundamental liberties. *See* Note, *Beyond Youngberg:* Protecting the Fundamental Rights of the Mentally Retarded, 51 Fordham L.Rev. 1064, 1080–1085 (1983).

The absence of behavior modification programs, and other therapies designed to treat self-abusive and other maladaptive behaviors also contravenes the residents' constitutional guarantee of training under *Romeo.* It denies to them the protection of their liberty interests in safety and freedom from undue restraint. Without appropriate programs individuals with such behaviors will harm both themselves and other residents, and may be, as they have been, subjected to control by otherwise unnecessary psychotropic drugs which can cause or aggravate the behaviors they are supposed to eliminate.

The record proves that while at the Center many clients have developed harmful or inappropriate habits (such as head-banging, feces eating, eye-gouging, and biting), which at least in part may be attributed to the effects of their unstimulating environment. The Center lacks resources to deal adequately with these and other inappropriate behaviors. Among the other ill effects of the failure to deal with these problems, is that they can delay or impede a client's movement into the community, and thereby further restrain him or her unnecessarily.

There were no behavior modification programs available at the Center between 1978 and 1980. None existed in late 1981. Although some clients now receive one-to-one staff attention, the employees assigned to these clients are usually nonprofessionals who are unaware of the contents or existence of the required programs for dealing with this behavior. There is a general absence of programs to deal with clients who bang their heads, bite, scratch, kick others, and engage in other forms of self-stimulation and self-abuse. Without a staff that knows how to implement such programs where they do exist, clients are denied the minimal programming to which they are constitutionally entitled.

Failure to provide adequate programming has created a vicious cycle. Clients learn inappropriate behavior in the institution. This gives rise to or increases their need for behavioral programming. When this programming is not forthcoming, the clients continue to deteriorate, to the point where they suffer serious intellectual, emotional, and physical damage and, at some point, an irreversible loss of potential.

The testimony of the qualified professionals bears out the inevitable conclusion that the residents of the Center are denied that training requisite to the maintenance and acquisition of basic self-care skills, as well as that necessary to ensure their safety and freedom from undue restraint. Conditions

at the Center meet none of the constitutionally minimal standards set forth in *Romeo.*

Plaintiffs have argued that the Equal Protection Clause of the Fourteenth Amendment entitles them to the same treatment as members of the Willowbrook class. *New York State Association for Retarded Children, Inc. v. Carey,* 393 F.Supp. 715 (1975); *New York State Association for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752 (1973). They note that more money is spent per capita on the Willowbrook class than on Center residents; that the former class receives more programming and a higher staff ratio; and that placement of the Willowbrook class in community facilities is proceeding at a more rapid rate. Conditions at Willowbrook were much worse than they are now at the Suffolk Center. Improvements to correct the Willowbrook class' prior deprivations, do not necessarily set a standard required to be followed in every state institution. *See New York State Association for Retarded Children v. Carey,* 393 F.Supp. 715, 717 (1975). It follows, therefore, that the programming and staffing requirements of the Willowbrook Consent Decree need not necessarily be afforded residents of the Suffolk Center.

### B. *Federal Statutes*

The plaintiffs' claims for improved conditions are supported by federal statutory law. While the Supreme Court held in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), that section 6010 of the Developmentally Disabled and Bill of Assistance Act, 42 U.S.C. § 6001 *et seq.,* setting forth "Congressional findings respecting the rights of the developmentally disabled," did not create substantive entitlements, 451 U.S. at 11, 19, 101 S.Ct. at 1536, 1540, the Court's decision did not preclude the possibility of statutory liability arising from violations of other sections of the act.

The Court's finding that the section 6010 bill of rights provisions were "hortatory, not mandatory," 451 U.S. at 24, 101 S.Ct. at 1543, was based on the absence of language specifying compliance as a condition for the grant of federal funds. *See* 451 U.S. at 22–27, 101 S.Ct. at 1542–1544 (specifically distinguishing section 6063(b)(5) from section 6010 in that it imposes a "specific condition"; and noting that in regard to "the well-settled distinction between Congressional 'encouragement' of state programs and the imposition of binding obligations on the State," the crucial inquiry is "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice.").

Other provisions of the act, such as Section 6011 require individual written habilitation plans containing specific statements of long-term and immediate objectives, expressed in behavioral or otherwise measurable terms, and implementation strategies for each developmentally disabled person. Unlike Section 6010, Section 6011 was enacted by Congress under the Spending Power. *See Pennhurst,* 451 U.S. at 23, 101 S.Ct. at 1542. Compliance with its enumerated conditions is obligatory. *See Pennhurst,* 451 U.S. at 27–29, 101 S.Ct. at 1545–1546. As detailed in the discussion of individual treatment plans above, the treatment plans at the Center do not meet the statutory requirements for individualized habilitation plans set out in 42 U.S.C. § 6011. *See also Garrity v. Gallen,* 522 F.Supp. 171, 213–215 (D.N.H.1981) (holding that Section 504 of the Rehabilitation Act, 20 U.S.C. § 794 is "predicated upon the need for individualized treatment," and thus requires an adequately documented individualized treatment plan for each resident of the state institution for the mentally retarded). Discussion of funding and of inspections and certifications by federal authorities demonstrate that federal statutory authority and funding is intended to ensure that the rights of Center residents under federal statutes are enforceable.

Nevertheless, the decree is based upon constitutional, not statutory, rights. Thus it is not necessary to decide the precise reach of federal statutes under *Pennhurst.*

## C. State Law

No state policy need be balanced against the constitutional command since the state's statutes support and go further than what the Constitution requires. The New York State Mental Hygiene Law explicitly provides mentally retarded and developmentally disabled citizens with a right to care and treatment. The state legislature specifically delegated to the State Office of Mental Retardation and Developmental Disabilities

> the responsibility for seeing that mentally retarded and developmentally disabled persons ... are provided with care and treatment, that such care and treatment is of high quality and effectiveness, and that the personal and civil rights of persons receiving care and treatment are adequately protected.

New York Mental Hygiene Law § 13.07(c). *See Woe v. Mathews,* 408 F.Supp. 419, 427–428 (E.D.N.Y.1976), *aff'd sub nom. Woe v. Weinberger,* 562 F.2d 40 (2d Cir.1977); *see also Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 31, 101 S.Ct. 1531, 1546, 67 L.Ed.2d 694 (1981) (right to treatment secured by state law may provide an independent and adequate ground to support lower court's order for community placement of residents of state institution for the mentally retarded).

Other provisions of the Mental Hygiene Law require humane treatment, New York Mental Hygiene Law §§ 13.21(b), 33.03(a), written treatment plans with a statement of treatment goals and of the appropriate programs to be undertaken to meet such goals, *Id.* § 29.13(a), (b), and an appropriate free public education for mentally retarded and developmentally disabled children between ages five and twenty-one. *Id.* § 33.-11; *cf.* The Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401 et seq. An institutional resident's right to custody of his or her personal property is specified. New York Mental Hygiene Law § 33.07. The state legislature has been particularly concerned about providing for the development of community residences for the mentally disabled. L.1978, c. 468, § 1, New York Mental Hygiene Law §§ 41.33, 41.34.

Many of the residents of the Center are not receiving the care and treatment to which they are entitled under state law. The testimony from both plaintiffs' and defendants' witnesses established that the Center does not provide each resident with programming of "high quality and effectiveness;" some receive no programming at all. Nor do all the treatment plans conform to the requirements of state law. Frequently, the residents' rights to personal property is not respected, in contravention of state law.

Finally, defendants' failure to develop community placements and services thwarts state legislative intent, as well as denying many of the state's mentally retarded citizens, what defendants say everyone should have—"the opportunity to live life to the fullest." As the Supreme Court once mused:

> For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide: "That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent.... The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but *the offspring of the inferior, or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be.*".... Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and *it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution.*

*Meyer v. Nebraska,* 262 U.S. 390, 401–402, 43 S.Ct. 625, 627–628, 67 L.Ed. 1042 (1923) (emphasis added).

## V. SUMMARY OF CONSTITUTIONAL FAILURES

There is no doubt that the initiation of this lawsuit, together with Director Fred McCormack's stewardship of the facility, has led to better conditions at the Center. The quality of life has been improved in the last few years. The fact remains, however, that continued residence at the Center is harmful to many of the residents. Defendants' failure to expeditiously develop enough appropriate day and residential programs in the community for the current population at the Center also amounts to a constitutional deprivation of many of their rights. *See Youngberg v. Romeo,* 102 S.Ct. at 2462.

Plaintiffs and defendants are both to be commended for their efforts in improving the environment at the Center. Yet staffing and other factors endemic to the management of a large facility make it an environment that fails to protect the safety of its residents, to prevent their regression, and to provide an opportunity to acquire those skills requisite to self protection and development.

In assessing remedies the court must be aware that funds necessarily expended for those who are members of this class may affect funds made available to those residing in their families' home. In this case, the dilemma is not as exquisite as it might have been were budgeted amounts for one group to be shifted by the executive to meet the demands of a decree. In any event, lack of funds for one group is not an excuse for denying constitutional rights to another. *See Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir.1977), *aff'g,* 373 F.Supp. 487, 497–498 (D.Minn.1974); *Lapeer Oakdale Parents Ass'n for Retarded Citizens v. Ochberg,* 492 F.Supp. 1035, 1037 (E.D.Mich. 1980); *Lora v. Board of Education of New York,* 456 F.Supp. 1211, 1292–1293 (E.D.N.Y.1978), *vacated and remanded on other grounds,* 623 F.2d 248 (2d Cir.1980); *Wyatt v. Stickney,* 344 F.Supp. 373, 377 (M.D.Ala. 1972), *aff'd sub nom; Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir.1974).

## VI. PROPOSED PLAN OF DIRECTOR

In its interim order of February 24, 1983, the court found that conditions at the Center did not meet constitutionally minimal standards. It ordered the Director to submit a plan correcting constitutional deficiencies.

On April 24, 1983, the plan was submitted. This plan lacked detailed steps, timetables, specific numbers of clients to be served, dollars involved, and explicit implementation.

Defendant McCormack has noted that he was constrained by fiscal and other policy determinations by the state. Such constraints cannot justify the continued constitutional deprivations to which New York State has subjected the residents of the Center. *See Arthur v. Nyquist,* 712 F.2d 809 at 814 (2d Cir.1983) ("a court is entitled to require money for programs that materially aid the success of the overall desegregation effort"); *Lapeer Oakdale Parents Ass'n for Retarded Citizens v. Ochberg,* 492 F.Supp. 1035, 1037 (E.D.Mich. 1980); *Welsch v. Likins,* 373 F.Supp. 487, 498 (D.Minn.1974) ("It does not suffice ... to show that conditions have been upgraded at [the state institution], that the situation will continue to improve in the future, and that even more achievements would be forthcoming were it not for the restrictions imposed by the legislature. It is the Court's duty under the Constitution, to assure that every resident ... receives at least minimally adequate care and treatment consonant with the full and true meaning of the due process clause."), *aff'd,* 550 F.2d 1122 (8th Cir.1977); *id.* at 1132 ("If [the state] chooses to operate hospitals for the mentally retarded, the operation must meet minimal constitutional standards, and that obligation may not be permitted to yield to financial considerations."). *See also Sherry v. New York State Educ. Dep't,* 479 F.Supp. 1328, 1339 (W.D.N.Y.1979); *Lora v. Bd. of Educ. of New York,* 456 F.Supp. 1211, 1292–1293 (E.D.N.Y.1979), *vacated and remanded on other grounds,* 623 F.2d 248 (2d Cir.1980).

The Director's plan was analyzed in detail at public hearings held on June 20 and 23, 1983. Witnesses were heard. The court, after consultation with the parties, made line by line changes in the Director's proposals. These decisions are embodied in the decree.

## VII. DECREE

### A. *Supervision*

■ Plaintiffs ask that a master or committee on the Willowbrook model be appointed to supervise execution of the decree. *See, e.g., Halderman v. Pennhurst State School & Hosp.,* 446 F.Supp. 1295, 1326–1328 (E.D.Penn.1977) (appointing and specifying tasks of special master), *aff'd in part and rev'd and remanded in part,* 612 F.2d 84 (3d Cir.1979), *rev'd and remanded,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), *aff'd on other grounds,* 673 F.2d 647 (3d Cir.1982), *modified,* 545 F.Supp. 410 (E.D.Penn.1982); *Hart v. Community School Board,* 383 F.Supp. 699 (E.D.N.Y. 1974), *aff'd,* 512 F.2d 37 (2d Cir.1975); *NYSARC, Inc. v. Rockefeller,* 357 F.Supp. 752 (E.D.N.Y.1973), 393 F.Supp. 715 (E.D.N. Y.1975). *See generally Society for Good Will to Retarded Children, Inc. v. Carey,* 466 F.Supp. 722, 725–728 (E.D.N.Y.1979).

There is no necessity for such close supervision. New York's executive and legislative departments have generally recognized their responsibilities towards clients at the Center; there is little reason to believe they will flout this court's decree. The striking improvements in the Center made under the leadership of the present Director in just a few years as well as his obvious competence and integrity give high promise of compliance without outside supervision. To assist the Director in monitoring the decree and in making required reports to the court, the decree directs him to appoint a high level assistant to help him comply.

A number of factors strongly suggest that the Director must be afforded maximum flexibility in fulfilling his obligations under the decree. Professional standards and practice are changing; theory is still in a state of flux. The Director of Suffolk Developmental Center must lead a large professional staff with many specialties and prerogatives. He must train lay workers in new techniques and inspire them to do demanding and often demeaning work with little financial reward. He must deal with unions and rigid state-wide labor agreements. He must meet the demands of officials and bureaucratic regulations at the municipal, county, state and federal levels. He must gain the confidence and support of families of clients. He must overcome the understandable reluctance of local residents who oppose community residences out of ignorance rather than malice. He must induce many private agencies to provide services throughout Nassau and Suffolk counties. Moreover, he must consider not only the needs of those at the Center, but the much larger group of retarded persons living with their families who should be supported in their homes or who should go directly to community centers. Having lawyers and the court constantly looking over his shoulder is one burden that should be minimized. *Cf. Arthur v. Nyquist,* 712 F.2d 809 at 812, 814 (2d Cir.1983) (reliance upon "good faith" of officials in charge of program and "deference" to them). Having been given the power and facilities he sought, there is no reason the Director of the Center should not comply with the decree in all particulars.

The court retains jurisdiction to make further orders in enforcing the decree. It urges the parties to work with each other in a spirit of helpfulness in order to avoid the need for further litigation. The primary responsibility for operating the Suffolk Developmental Center and for caring for the welfare of its clients must rest with the state and its officials, not the courts. The Director has been given the maximum possible authority and aid to enable him to do his constitutional and professional duty. He should be allowed to do his important and difficult work with a minimum of interference from the law.

### B. *Terms*

1. Defendants shall implement the annexed Plan; and

2. In order to advise plaintiffs, defendants and the Court as to defendants' progress with compliance and failures to comply with the annexed Plan, defendants shall hire a reporting officer and one secretary forthwith. The reporting officer shall be an appropriate professional in the field of Mental Retardation and Developmental Disabilities and shall regularly report to the Director of Suffolk Developmental Center and the defendants. The reporting officer shall issue written reports to the Court, with copies to counsel for plaintiffs and defendants on September 1, 1983, and every April 1 and September 1 for the years 1984, 1985, 1986 and 1987. These written reports shall address defendants' compliance and failures to comply with each of the items set forth in the annexed Plan. The reporting officer shall be accessible to plaintiffs, but need not furnish plaintiffs with any written materials other than the biannual written reports specified herein, and

3. The Court retains jurisdiction until further order.

GOAL I: To Assure Proper Programming, Particularly for those Over the Age of 21 Not Educated in the Public School System

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To reorganize the delivery of treatment services so that it more effectively develops the client in his environment of Suffolk Developmental Center, and in a more normalizing manner provides better staffing coverage and consistency in the delivery of clinical services. | 1. By September 1, 1984, organize services by client abilities, grouping them in specific residential areas for the enhancement of programming, facilitating access to program service space, and reducing the need for a complex transportation system. Grouping will reflect treatment services needed and provide for planned upward mobility, with the ideal result being the placement of appropriate clients into the community.<br><br>The above relocation which is limited to and applies only to the placement of clients into the community and not for any other reason will be accomplished by the following:<br><br>a) Identify clients with similar abilities and group them in residential clusters.<br><br>b) Identify existing and projected program space that will accommodate these clusters and be in closest proximity to their assigned residential area, especially for:<br>   1. Non-Ambulatory<br>   2. Blind<br>   3. Geriatric<br><br>c) Refine program curricula for the areas identified utilizing new and age appropriate technologies.<br><br>d) Develop the necessary training and support systems to facilitate achieving the objective. |
| 2. To improve the existing goal oriented programming for residents over the age of 21. | 1. By September 1, 1984, reassess existing programs of the over age 21 population to determine if they are meeting individual client needs and where they are not, revise curricula to encompass the whole client and improve his skills in real life.<br><br>2. a) An upwardly mobile continuum of services will be developed to provide training to clients having from the least to the greatest abilities. This continuum will begin with basic living skills (including grooming, toileting, eating), and move into more advanced living skills (such as domestic activities). The next step will focus on the development of prevocational skills (e.g., motor development, coordination, and vocational readiness) and terminate in vocational habilitation (including such activities as landscaping assistance, housekeeping assistance). Throughout the entire |

| OBJECTIVE | ACTIONS |
|---|---|
| | continuum, attention will be paid to socialization and deinstitutionalization. |
| | 2. b) By July 1, 1984, Program Center(s) will be designed to modify maladaptive behaviors which would prohibit clients from progressing through the programming continuum and may inhibit eventual placement provided that the establishment of such center(s) shall not reduce the level of care provided to other clients below the minimum levels required under this decree. |
| 3. Provide goal oriented programming to all residents age 21 and under. | 1. By July 1, 1984, all residents age 21 and under shall receive school education programming on a full year (12-month) basis. |
| 4. Improve upon existing systems to assure that clients of Suffolk Developmental Center receive programs that meet their needs. | 1. By September 1, 1983, on a five day per week 12 month per year basis, six hours of active, structured programming shall be made available to each client in addition to recreation and leisure activities unless medically, socially or psychologically contraindicated as shown by the certification of a QMRP (Qualified Mental Retardation Practitioner) having a State certificate, but lack of resources shall not be the basis for such certification; provided, however, that each client has the right, after being fully advised, to refuse any such programming. |

Additional actions under objective 4:

2. Develop a training program to facilitate the success of program philosophy and goals.

3. Streamline the current record keeping system to permit therapists more time for direct client contact.

4. Provide realistic and less time consuming client co-ordinator functions.

   a) Develop a more simplified client coordinator system that can be managed by direct care staff under the supervision of a Qualified Mental Retardation Practitioner (QMRP); one that will meet the mandates of all regulatory agencies.

5. Make more meaningful a quality assurance system that will assure clients are receiving programs which best meet their demonstrated needs and evaluate their mobility or fixation at an appropriate level; e.g. assuming no inhibiting neurological impairment client program will be altered if it is not successfully addressing a lack of toileting skills.

6. By September 1, 1984, an appropriate toilet training program shall be made available to all clients not presently toilet trained, unless such program is medically or physiologically contraindicated as shown by the certification of a QMRP (Qualified Mental Retardation Practitioner) having a State certificate.

GOAL II: An Increased Direct Care Staff Ratio at the Ward Level and Dormitory Care Level, as well as in Various Professional Specialties

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To maintain an overall staff to client ratio of no less than 1.78:1 and allow for various administrative flexibilities and prerogatives, until August 31, 1987. | 1. By November 1, 1983, an overall staff to client ratio of no less than 1.78 to 1 shall be met and maintained within 1%. To meet this objective, the Director shall have the authority and be required to fill and refill any vacant position without regard to any budgetary restrictions or other limitations, unless otherwise ordered by the Court. At the end of fiscal year 83–84, the impact of this ratio shall be assessed and an amended staffing ratio for fiscal year 84–85 may be established upon a further order of the Court. |

| OBJECTIVE | ACTIONS |
|---|---|
| | 2. On an as needed basis, increase the fill level in selected direct care and clinical care titles and/or lay off in titles determined to be in excess and redeploy these resources to functional areas to augment services, within a 10% variation on fill levels, subject to the provisions of statute and collective bargaining agreements. |
| | 3. On an as needed basis, utilize split items for part-time employment, stipend employment, traineeships, etc., to the extent of the Director's present authority. |
| 2. To create an alternate resource to employees removed from assigned duty for training purposes. | 1. By March 1, 1984, defendants shall establish a fifty (50) person item pool, over and above the 1.78:1 staff to client ratio, within a 6% variation. |
| 3. To increase direct care staff available in the ward at times of maximum activity. | 1. Review all direct care assignments and, based on proposed program changes, develop a correct distribution for each client area for each shift, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |
| | 2. Continually review and readjust direct care assignments and schedule based upon client needs, program, and residential goals, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected union and employees. |
| | 3. Utilize all new employees and returning leave employees to fill in identified gaps by centralizing these items for deployment, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |
| | 4. Utilize staff from areas vacated by clients going to day program to assist in other direct care or program areas, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |
| | 5. Request that OMRDD assess the current utilization of housekeeping personnel with an eye toward increasing their effectiveness on the living unit, thereby increasing direct care staff availability to clients. Assessment should include the use of part-time, flex-time, and other alternate work schedules when filling housekeeping vacancies, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |
| | 6. Utilize the incontinent pads or disposable diapers to free direct care staff from the "folding and sorting" activity or provide additional staff to fold cloth diapers. |
| | 7. All clients whose program plans indicate that they can benefit by leaving the center to shop for clothing shall be given the opportunity to do so. Those clients for whom outside shopping trips are medically, socially or psychologically contraindicated as certified by a QMRP (Qualified Mental Retardation Practitioner) having a State certificate shall have their clothing ordered via vendor or catalog, so long as the absence of vehicles or staff for off-campus shopping is not the basis for the denial of client shopping trips. |
| | 8. With such training as is required, food service personnel will more actively participate in meal time programming and thereby supplement direct care staff involvement, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |

| OBJECTIVE | ACTIONS |
|---|---|

ACTIONS

9. Request that all parents/guardians, relatives and friends of Suffolk Developmental Center clients, as well as members of the community, volunteer to give assistance towards client service, as is frequently the practice in voluntary and religious agencies.

10. Increase volunteer programs and encourage older parents and members of the community to become Foster Grandparents or Senior Companions.

11. Reinforce performance standards and, through the performance evaluation system, reinforce direct care responsibilities to client assignments, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

12. Restructure current performance evaluations to continue to reinforce supervisory responsibilities of mid-level supervisors and nurse administrators in supervising direct care to insure maximum utilization of therapy aides, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

13. Expand the utilization of former Suffolk Developmental Center staff as per diem employees (substitute roster), subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

14. Explore executive initiative to rehire early retirees, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

4. To increase the provision of needed clinical support services to clients.

1. Cluster professional personnel in relation to client needs as reflected by client abilities grouping.

2. Continually review the utilization and need for specific clinical titles. Adjust clinical assignments and/or employment levels as required by changing client needs.

3. The assignment of clinician duties will place a priority on service delivery as opposed to record keeping; and this will be documented through the performance evaluation system.

4. Expand performance standards and review the organizational placement of discipline coordinators.

5. Expand performance standards for clinical personnel to include the training and supervision of direct care staff, on all shifts, in the program skills and activities.

6. Seek the involvement of professional schools by providing clinical field experience at Suffolk Developmental Center campus.

7. Until September, 1987, where vacancies in professional staff have not been filled after good faith efforts to do so, equivalent personnel shall be made available by contracting for part-time services and other devices not inconsistent with statute or collective bargaining agreements, and funds may be shifted from line budget items for this purpose.

8. Continue the planning and expedite the development of training programs for high school and undergraduate students giving them the opportunity to work part time at Suffolk Developmental Center during peak client activity times, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

| OBJECTIVE | ACTIONS |
|---|---|

9. Continue to plan and enter into agreements with SUNY at Stony Brook School of Medicine and Allied Health Services, for a closer relationship which could lead to a revised system of providing medical services at Suffolk Developmental Center, including the possibility of SUNY taking over the management of medical and medical ancillary services as well as the utilization of physician extenders, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

**GOAL III:** Develop an Improved Training Program for Those Charged With Care of Clients so That Necessary Program Activities are Incorporated in the Context of Clients' Daily Living

| OBJECTIVE | ACTIONS |
|---|---|

1. To increase the relevancy of training for staff charged with care of clients.

1. Increase decentralization of Staff Development and Training Services by assigning total responsibility for the management of all aspects of training to a Staff Development Specialist for a designated residential programming area.

2. Establish a residential Training Unit/Assessment Center to be utilized for assessing staff competencies, for staff training and for field placement of students from academic institutions.

3. Utilizing adult-learning theory, this unit will increase efforts to provide total competency-based training by:

   a) Identifying basic and site specific competencies expected in job performance.

   b) Developing realistic assessment methods;

   c) Having staff who demonstrate competency in any conceptual or skill area exempted from training in that content area. Life safety skills will be assessed every six months and retraining required as indicated by skill assessment, within applicable federal and state regulations.

   d) Revising present curricula and developing new ones as necessary to reflect changing client needs to assure relevancy of training.

   e) Incorporating evaluations of training into the curriculum revision process.

4. An additional fund of up to $25,000 shall be established to permit contracts for outside consultants to train Long Island DDSO trainers when changing client needs require staff training beyond the scope of the expertise of employees.

5. Utilizing affirmative action practices, staff above-named training unit with a team of employees who demonstrate the ability to provide client care meeting all applicable standards, and can serve as a model for training and retraining. No more than five persons may be assigned to this unit without regard to classification, notwithstanding seniority or other contractual requirements, after consultation with the appropriate labor unions. Any persons other than these five must be assigned to this unit in accordance with the provisions of the applicable collective bargaining agreement.

6. Establish an "Ad Hoc" training advisory committee with representation from Staff Development and Training, Suffolk Developmental Center Client Services, state-operated community-based services, voluntary agencies,

| OBJECTIVE | ACTIONS |
|---|---|
| | public relations certification unit, all labor organization and the Society for Good Will to Retarded Children, Inc. This committee will provide input into the planning, implementation, and evaluation of training. |
| | 7. Revise the training delivery model to include the appropriate use of: |
| | a) Onsite, hands on, experiential learning. |
| | b) Role modeling in the training unit utilization a "buddy system". |
| | c) Centralized classroom learning. |
| | 8. Expand the training of client care work teams from residential units and program areas in team process, communication skills, awareness, and continuity of client care by integrating direct care staff of all three shifts, mid-level supervisors, professional staff, treatment team leader, parents and support service personnel. |
| | 9. Revise delivery of community training programs so that staff identified for transition into community settings are trained for community-specific competencies while working with clients at Suffolk Developmental Center who are identified for placement by incorporating such training into the job descriptions for community residence positions. |
| 2. To expand the availability of training opportunities for staff. | 1. Through the use of existing staff resources, create a floating pool of 50 staff to be utilized for releasing unit staff for training. |
| | 2. Conduct feasibility study and cost analysis for developing a training resources library within the "Training Unit/Assessment Center" to facilitate self-paced learning and provide availability to staff on all three shifts. |
| | 3. Expand the pool of trainers by: |
| | a) Establishing a mechanism of sharing trainer resources within the Southeastern County Service Group and New York City. |
| | b) Developing a training consortium with voluntary agencies in the Long Island DDSO catchment area. |
| | c) Utilize more parents and guardians of clients in training programs. |
| | 4. a) Continue to negotiate academic credit (extending beyond life-experience credit) for training received at Suffolk Developmental Center. |
| | b) Negotiate increased numbers of university affiliations for: |
| | — Student field placement at Suffolk Developmental Center in exchange for academic faculty offering staff training at Suffolk Developmental Center. |
| | — Academic programs (degree and certificate bearing) at Suffolk Developmental Center. |
| 3. To increase the application of knowledge and skills acquired through training to job performance. | 1. Establish a mechanism for evaluation the effectiveness of training and application on-the-job in both residential and treatment areas which feeds back to Staff Development and Training Department to be utilized in revising training programs. The evaluation process will include both trainees and supervisors. |

GOAL IV: Proper Repairs to Buildings, Particularly as to Heating
and Air Conditioning

| OBJECTIVE | ACTIONS |
|---|---|

**1. To reorganize the delivery of maintenance and environmental services.**

1. Establish the Environmental Systems Department.

2. Until September, 1987, on a temporary basis, reclassify Plant Superintendent position from "B" to "A".

3. Until September, 1987, on a temporary basis, reclassify two selected items to a "B" grade level or environmental engineer and a sanitarian to direct and work respectively with the Environmental Systems Department.

4. Shift and reclassify selected vacant items to create additional supervisory titles in various maintenance departments, excluding the Environmental Systems Department.

**2. To reduce the number of repairs required.**

1. Expand the "Swat Team" repair concept of performing comprehensive repairs on a scheduled basis in one building at a time, to include the prevention maintenance of non-specialized equipment.

**3. To improve the quality and quantity of work production.**

1. Develop and implement a work production standards reference manual. (The intent of this manual is to give the maintenance supervisors work production and quality standards by which to gauge the productivity of their subordinates, include these standards in the performance evaluation system.)

2. Develop and implement a formal training program for maintenance and environmental systems staff.

3. Negotiate with BOCES and private trade schools the use of Suffolk Developmental Center as a practical training site for their students (with particular emphasis toward affirmative action programming), and arrange for slots in those schools for selected Suffolk Developmental Center Plan Engineering staff to learn new skills or upgrade present ones.

4. Contract with private tradesmen to perform specific maintenance and environmental systems functions, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

5. Initiate a study to determine the feasibility and benefits of paying plant engineering personnel wages comparable to the State University System.

6. Hold production contests.

7. Establish a "Quality Circle" concept in Plant Engineering with a view toward more timely, effective, and positive resolution of maintenance problems.

8. Change existing staff pass days and work hours by introducing flextime, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. This would result in greater maintenance coverage over an expanded workday.

9. On or before June 1, 1984, an additional fund of up to $35,000 shall be established to hire as temporary civil service summer employees (high school and college students and selected clients) to function as helpers for grounds, maintenance and environmental systems assistance, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

| OBJECTIVE | ACTIONS |
|---|---|
| | 10. Improve risk management efforts within the Maintenance Department in order to reduce the legitimate use as well as the abuse, of workmen's compensation. |
| | 11. Utilize a facility-wide "long-term leave pool," subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |
| 4. To improve the responsiveness and efficiency of Work Control. | 1. Establish realistic in-service training for supervisory personnel, specific to job title. |
| | 2. Computerize the central mechanical stores inventory. |
| | 3. Formulate for shop distribution, a plant engineering parts catalog, which will allow for faster identification of parts that must be ordered. |
| | 4. Increase the minimum and maximum stock levels, especially for those specialty parts that are difficult to locate or have manufactured. |
| | 5. Purchase appropriate equipment (to include those that save labor and manpower) and parts to make proper repairs. |
| | 6. Continue the fabrication or purchase and installation of room numbers for all rooms in all buildings at Suffolk Developmental Center. This will allow for faster identification of problem areas for repair purposes. |
| | 7. Clearly identify capital construction issues, e.g. roofing, fail safe valves and systems, heating, and air conditioning, for inclusion in capital budget request so that this major, time consuming work is not handled by local staff, by default. Fail safe valves and systems must be installed and operational on or before July 1, 1984. |
| | 8. Consider maintenance and support services, transportation needs in facility-wide transportation study to include the purchase of electric vehicles, a parts delivery truck, and additional mobile radios so as to speed delivery of workmen and materials to work sites. |
| 5. To improve environmental conditions in all buildings at the facility. | 1. By September 1, 1983, all buildings must meet federal ICF/MR standards of safety and habitability, and shall be made fully safe and habitable including repairs of all leaky roofs, broken or missing windows, full operation of all air conditioning units, heating systems and other known problems with the physical plant. |
| 6. To expand utilization of existing rest and recreational facilities. | 1. Assign project to Quality of Work Life Committee to determine what additional facilities are required and can be developed within existing resources. (Subdivisions client and staff, C & S). |
| |    a. Subdivision C (Client) will utilize parent participation to plan for additional client lounges and family visitation areas. |
| |    b. Subdivision S (Staff) will utilize union and management participation to develop staff lounges, activity center(s), and quiet areas for personnel. |
| |    c. Subdivision C & S (Client & Staff) will combine to formulate plans to develop the grounds of Suffolk to meet environmental needs and to stimulate the increased use of outdoor areas for client programming and recreation. |
| | 2. Expand Volunteer Services capabilities to enlist aid from local schools, fraternities, scouting organizations, civic groups, etc., to aid in grounds beautification projects and to provide outdoor recreation areas, etc. |

GOAL V: Every Client is Provided, as Required, Adequate Prosthetic Devices; Special Clothing Where Required; Specialty Designed Wheelchairs and Carts Where Required, and Sufficient Numbers of Vehicles to Transport Them; and Furniture Necessary and Appropriate for Clients.

| OBJECTIVE | ACTIONS |
|---|---|

**1. To refine the existing system to further ensure clients' needs are met.**

1. Screen and monitor, through reports by staff and visitors and a computerized reporting system, clients at least semi-annually to determine continued appropriateness of special furniture, clothing, wheelchairs, and adaptive devices.

2. Recruit additional qualified professionals needed to deliver services to all clients with a documented need for special adaptive (physical and occupational therapy) services.

3. By July 1, 1984, properly adapted wheelchairs and sufficient special equipment shall be provided to all clients, within a 5% variation in prescription. Such equipment shall be provided to persons newly admitted to the center within six months, and six months shall be allowed for new equipment when a change in prescription occurs. This requirement shall be accomplished without regard to any obstacles.

4. Expand adaptive equipment shops, including the supply of parts and materials, for construction of adaptive devices and special clothing. Involve skilled parents and guardians and other volunteers in the work of the adaptive equipment shops.

5. By July 1, 1984, the facility shall have in place sufficient furniture adapted and suitable to the needs of clients; any state regulations which would impede the acquisition of such furniture are superseded.

   a) Expand contracts with minority firms, county, State, and Federal correction agencies, for the manufacture of adaptive devices, furniture, equipment, and other specialty items.

   b) Develop a demonstration project with furniture companies to manufacture more appropriate and durable furniture, e.g. chairs, couches, tables, etc.

   c) Until September, 1987, any State regulations which restrict the purchase of furniture for client areas based on cost or other factors are lifted so that such furniture may be selected on the basis of safety, durability and comfort.

7. Expand the utilization of existing tickler systems to monitor timely arrival of items as ordered.

8. Develop a larger number of pilot test programs. For example:

   a) A unit serving the wheelchair bound population develops a contract with a vendor to provide, on a pilot basis, prone and side layer chairs in place of currently used multi-position chairs.

   b) Develop a request for proposal (RFP) for a research project to more expeditiously, safely, and humanely move groups of clients in wheelchairs over short distances.

   c) Expand university affiliations to enable students to pilot test innovative techniques and programs with wheelchair bound clients.

| OBJECTIVE | ACTIONS |
|---|---|

9. Decrease the need for wheelchair repair by, e.g.:

 a) Attempt to permanently seal a larger number of wheelchair parts to limit accessability to vermin.

 b) Attempt to more securely affix a larger number of wheelchair parts to minimize parts falling off and becoming lost or misplaced.

10. Develop a contract with wheelchair vendor to maintain an outlet at Suffolk Developmental Center with sales salesperson and repairperson scheduled regularly, but failure to inability to develop such contract shall not excuse compliance with goal V, objective 1, action 3.

11. Continue to expand the appropriate utilization of clothing wardrobes in accordance with client ability.

12. By December 1, 1983, all clients shall be provided with such special and other clothing and footwear as may be required by professional staff members, and all limitations on state purchasing of such clothing are suspended until September, 1987. Any clients newly admitted to the facility shall be provided with such special and other clothing and footwear within 45 days of admission.

13. Defendants shall develop an improved system for the marking and segregating of individual client clothing.

14. By December 1, 1983, all clients shall be provided with such prosthetic devices including footwear as may be required by professional staff members. Any clients newly admitted to the facility shall be provided with such prosthetic devices including footwear within 90 days of admission.

2. To refine the existing transportation network for transferring clients, particularly the non-ambulatory, to all services including day program and leisure activities.

1. By December 1, 1984, the facility shall provide sufficient safe and appropriate transportation to meet the programmatic and other needs of all clients, on and off the grounds of the facility.

2. By December 1, 1984, the facility shall purchase a new ambulance, while maintaining its existing ambulance in good repair.

3. Involve parents, guardians, and volunteers in escorting clients, particularly the non-ambulatory.

4. Refine the existing system in order to provide clients' programs in close proximity to residential building.

5. Revise and expand client "travel training" programs to increase clients independence in traveling between residential and program buildings.

6. Continue to seek alternate means to establish a transportation schedule for clients' programs with consideration given to:

 a) Flexibility in scheduling vehicles throughout the clients' waking hours.

 b) First transporting clients traveling the longest distances to off-grounds and on-grounds programs.

 c) Making a minimum of stops in each residential area.

7. On a pilot basis, purchase buses or trams designed with minimally inclined non-electric boarding platforms. (Design may include wide doorways to board several non-ambulatory clients simultaneously and to accommodate multi-position wheelchairs.)

GOAL VI: An Increased Rate of Transfer from the Central
Suffolk Developmental Facilities to Residential
or Other Small Community Facilities.

| OBJECTIVE | ACTIONS |
|---|---|

1. To continue to maximize existing procedures and develop new concepts for obtaining suitable residential sites for the purpose of developing community placements.

1. By March 31, 1987, 400 clients from Suffolk Developmental Center shall be placed in community placements of one (1) to ten (10) bed size, with a few of such 400 clients placed in community placements of up to fifteen (15) bed size which, however, will be the exception. It is further provided that the average size of each community residential facility shall be 8.5. These placements shall include the development of community residences and intermediate care facilities at least as follows:

By March 31, 1984:  10 units
By March 31, 1985:   8 units
By March 31, 1986:  11 units
By March 31, 1987:  11 units

These requirements shall not limit the placement of other class members in larger community facilities. All clients placed in such community placements shall receive 6 hours of active, structured programming per day, on a five day per week 12 month per year basis, unless medically, socially or psychologically contraindicated as shown by the certification of a QMRP (Qualified Mental Retardation Practitioner) having a State certificate, but lack of resources shall not be the basis for such certification; provided, however, that each client has the right, after being fully advised, to refuse any such programming. Such clients shall also receive all medical and other support services necessary.

2. The implementation of an investor program to facilitate property lease and acquisition.

3. The construction of homes for specific populations whose needs cannot be met by existing housing stock, such as the non-ambulatory, geriatric, and sensory impaired.

2. To increase recruitment efforts for family care (foster care) and personal care providers.

1. Improve recruitment efforts utilizing such strategies as radio and TV, print media, and continuous, widespread contact with charitable, religious, and service organizations to recruit potential providers of service.

3. To develop an approach which would facilitate natural families accepting their offspring back into their homes.

1. Conduct a feasibility study to determine the degree of parental interest in becoming involved in such a program.

2. On a pilot demonstration basis, to be evaluated after one year's duration, sufficient funds shall be made available to:

a) provide a stipend to twelve (12) families which would cost less than the equivalent of 1.78 staff per client.

b) Increase the availability to existing in-home support, such as homemaker services.

c) Utilize existing resources to provide respite services to prevent burn-out and recidivism within these twelve (12) families.

4. To improve and expand the network of other than residential services to ensure that client placements are qualitatively maintained.

1. Make available community-based day programs such as education, day treatment, and day training to accommodate the needs of the client population to be placed in the various residential programs.

2. Make available to residential providers and their clients the means to access necessary support services, with specific reference to medical and dental services.

3. Provide case management services to the client population placed on the basis of individual client need, for the purpose of monitoring the quality of that

| OBJECTIVE | ACTIONS |
|---|---|
| | placement, and wherever necessary, provide technical assistance to the client for the purpose of accessing needed services. |
| 5. To better utilize client need as the determinant for the type of community resource selected. | 1. Expansion of the request for proposal process whereby clients are grouped according to specific representative characteristics, e.g., self-preservation, functioning level, age, in preparation for placement in community-based living situations. |
| | 2. Clients to be placed in a given fiscal year are designated prior to the beginning of that year so that residential resources such as family (foster) care, personal care homes, community residences, intermediate care facilities, and skilled nursing facilities can be made available to meet client needs. |

So ordered.